```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION


 3

    UNITED STATES OF AMERICA,      )
 4          Plaintiff,             )
                                   )
 5   -vs-                          )   Indictment No.
                                   )   1:12-CR-205-ODE
 6                                 )   Volume 5
    WOODROW RUDOLPH DIXON (1)      )   Pages 609-712
 7   and KIRK L. FLOYD (2),        )
            Defendants.            )
 8

 9

10
              Transcript of the Jury Trial Proceedings
11           Before the Honorable Orinda D. Evans,
             United States District Court Senior Judge
12                    November 22, 2013
                       Atlanta, Georgia
13

14
    APPEARANCES OF COUNSEL:
15
    On behalf of
16   the Government:                 Mary L. Webb,
                                     Assistant United States Attorney
17
                                     William R. Toliver,
18                                   Assistant United States Attorney

19   On behalf of
    Defendant Dixon:                Stephen R. Scarborough, Esq.
20
    On behalf of
21   Defendant Floyd:               Akil K. Secret, Esq.

22

23   Amanda Lohnaas, RMR, CRR
    Official Court Reporter
24   United States District Court
    Atlanta, Georgia
25   (404) 215-1546
```

610

1                                INDEX

2    Witnesses for Defendant Dixon

3    Joseph Z. Thomas
          Direct Examination by Mr. Scarborough        613
4

5    Defendants Rest                                   616

6    Closing Argument by Ms. Webb                      622

7    Closing Argument by Mr. Scarborough               634

8    Closing Argument by Mr. Secret                    652

9    Rebuttal Argument by Ms. Webb                     666

10   Charge to the Jury                                678

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Friday, November 22, 2013, 10:05 a.m.; jury not

2    present.)

3              THE COURT:  Counsel, are you ready?

4              MR. SCARBOROUGH:  Yes, Your Honor.

5              THE COURT:  Have you all made your decisions yet

6    about whether the defendants will testify?

7              MR. SCARBOROUGH:  Yes, Your Honor.

8              MR. SECRET:  Mr. Floyd will not testify.

9              MR. SCARBOROUGH:  Nor will Mr. Dixon, Your Honor.

10             THE COURT:  Let me go ahead and address them on this

11   subject, then.

12             I want to make sure both of you understand, Mr. Dixon

13   and Mr. Floyd, that you do have the right to testify on your

14   own behalf.  Now, since your counsel have announced that you

15   are not going to testify, I am assuming they have advised each

16   of you that it would be in your best interest not to testify in

17   this case.  And if that is the situation, then in all

18   likelihood you should follow your lawyer's advice because your

19   lawyer has your best interest at heart and these lawyers are

20   experienced trial lawyers.

21             However, under the law, the defendant gets to make

22   the final decision on whether to testify.  It's a personal

23   decision, and if either of you want to testify, then subject to

24   the caveats I've just given you, you could testify.

25             So I would like to ask each of you, Mr. Dixon, do you

```
 1    want to testify on your own behalf in this trial?

 2              THE DEFENDANT:  No, ma'am.  I appreciate you asking

 3    me, thank you.

 4              THE COURT:  Thank you.  And, Mr. Floyd, do you want

 5    to testify?

 6              THE DEFENDANT:  No, ma'am.

 7              THE COURT:  All right, thank you.  All right, now

 8    let's see, where are we?  You have a few more witnesses?

 9              MR. SCARBOROUGH:  Just one, Your Honor.

10              THE COURT:  Okay.  All right, bring the jury in,

11    please.  And we will return to the subject of Rule 29 motion.

12              (Jury returned to the courtroom at 10:09 a.m.)

13              THE COURT:  Good morning, members of the jury.

14              THE JURORS:  Good morning.

15              THE COURT:  Call your next witness.

16              MR. SCARBOROUGH:  Yes, Your Honor.  On behalf of

17    Mr. Dixon we call Joe Thomas.

18              THE COURTROOM DEPUTY:  Step forward and be sworn,

19    please.  Just come right on up.  Raise your right hand.

20                        JOSEPH Z. THOMAS,

21    having been first duly sworn or affirmed, was examined and

22    testified as follows:

23              THE COURTROOM DEPUTY:  Okay, be seated and state your

24    full name for the record.

25              THE WITNESS:  My name is Joseph Zachary Thomas.
```

1                          DIRECT EXAMINATION

2     BY MR. SCARBOROUGH:

3     Q.    Good morning, sir.

4     A.    Good morning.

5     Q.    Where do you live and what do you do for a living?

6     A.    I live in Douglasville, Georgia.   I'm a realtor and a car

7     dealer.

8     Q.    And do you know Mr. Dixon?

9     A.    Yes, I do.

10    Q.    And how do you know him?

11    A.    He's a friend of mine.

12    Q.    And for how long have you known him?

13    A.    About three and a half years.

14    Q.    And what's the nature of your relationship with Mr. Dixon?

15    A.    Friend and a business partner.

16    Q.    And in what business do you all work together?

17    A.    In the car business.

18    Q.    Have you socialized with Mr. Dixon and come to know his

19    family?

20    A.    Yes, I have.

21    Q.    Okay.   And so is it fair to say that you have business

22    interactions with him and also personal ones?

23    A.    That's correct.

24    Q.    Have you also become acquainted through your business work

25    with one Brian Guyton?

1    A.    I have.

2    Q.    And have you met his family?

3    A.    Yes, I have.

4    Q.    Okay.  Now, let me ask you, based on your relationship

5    with Mr. Dixon and your experience with him, have you had an

6    opportunity to develop an opinion about his character for

7    law-abiding behavior?

8    A.    Yes.

9    Q.    And what is that opinion, sir?

10   A.    He respects the law.  He's a good man, just a wonderful

11   person, really.  He's just a caring person, a giving person.

12   Q.    Thank you.  And would you have had an opportunity to

13   develop an opinion about his character for being peaceful or

14   peaceable?

15   A.    Yes.  He's very peaceful.  He's a mentor to so many.  He

16   makes a lot of jokes and keep people laughing and life of the

17   party.  He's just a great individual.

18   Q.    Is he a storyteller?

19   A.    Yes, he is, yes, he is.

20   Q.    Sir, with regard to Mr. Guyton, did there ever come a time

21   when you became aware of some emotional distress on

22   Mr. Guyton's part?

23   A.    Yes.

24   Q.    And could you tell the jury about that just briefly?

25   A.    Well, Brian was in the car business but Brian was

1    depressed, I guess.  He thought of killing himself.  And so we

2    would have to just talk to him and say it's not worth it,

3    what's going on with you.  He said he would have to turn

4    himself in.  For what?  Turn himself in for what?  We didn't --

5    I didn't know what was going on.  But he was just really, I

6    guess, was having a tough time with whatever he was going

7    through.

8    Q.   And I think you mentioned that you and Mr. Dixon together

9    tried to talk to Mr. Guyton and say don't do that, don't hurt

10   yourself?

11   A.   Definitely.  Definitely tried to talk to him, keep him

12   upbeat, think about your kids, that kind of thing.

13   Q.   I think, was one of the reasons that you were concerned

14   about him?

15   A.   Pardon me?

16   Q.   Was that one of the reasons you said that to him, was you

17   were concerned about his well-being?

18   A.   Definitely.  I didn't want him to take his life.

19   Q.   But did you say also honestly there was sort of a

20   self-interest reason that you wanted to continue to have

21   Mr. Guyton around too?

22   A.   Yeah.  To run the car business, the wholesale business

23   from Brian.

24   Q.   Was it your observation that he was skilled in the art of

25   selling high-end cars?

1    A.    Yes.

2    Q.    And was that a new venture for you?

3    A.    It was.

4    Q.    Okay.

5               MR. SCARBOROUGH:  Nothing further.  Thank you.

6               MS. WEBB:  No questions, Your Honor.

7               THE COURT:  You can step down, sir, and you are

8    excused.

9               THE WITNESS:  Thank you.

10              MR. SCARBOROUGH:  Mr. Dixon rests, Your Honor.

11              MR. SECRET:  Your Honor, on behalf of Mr. Floyd we

12   have no evidence to present.

13              THE COURT:  All right.  Does the government have any

14   surrebuttal?

15              MS. WEBB:  No, Your Honor.

16              THE COURT:  All right.  Members of the jury, step

17   into the jury room, please.

18              (Jury retired from the courtroom at 10:13 a.m.)

19              THE COURT:  Please be seated.  First let me hear any

20   motions the defendants might have.

21              MR. SCARBOROUGH:  Yes, Your Honor.  I would renew our

22   motion for judgment of acquittal under Rule 29.  I would again

23   mostly rest on the record, inviting any questions the Court

24   has.

25              One particular thing I would say is that while there

1    was a lot of testimony kind of dancing around it, I'm not sure

2    that there was ever -- you know what, I withdraw that.  I was

3    worried about the barrel of the weapon but I know the last

4    witness did purport to measure it there.  So without conceding

5    that, I'll withdraw that particular -- I'll just make it a

6    general Rule 29.

7              MR. SECRET:  We rest on our previous motion on the

8    evidence, Your Honor.

9              THE COURT:  All right.  I'll deny the motions.

10             Okay, couple of things.  One is I understand you all

11   have filed -- the government has prepared another verdict form

12   and that counsel have looked at it; is that correct?

13             MR. SCARBOROUGH:  Yes, Your Honor.

14             MR. SECRET:  Yes, Your Honor.

15             THE COURT:  Now, I want to point out to you, and I

16   don't mean to raise alarms with this by any means, but

17   Ms. Hanna has pointed out to me that always in the past we've

18   had one verdict form for each defendant.  This is a combined

19   verdict form.  I don't see any reason why we can't do it this

20   way but I do want to raise the point for defense counsel's

21   consideration.

22             MR. SCARBOROUGH:  Your Honor, I guess I was just

23   assuming that was this Court's practice but I've seen it done

24   both ways.  I don't think I have any particular objection.

25             THE COURT:  Okay.

1          MR. SECRET:  I don't have any particular objection to

2     it in this case, Your Honor.

3          THE COURT:  All right, well, we will proceed with the

4     combined verdict form.

5          We had talked previously during the trial about the

6     404(b) instruction.  You all had tendered the pattern charge on

7     404(b) and I'm thinking about adding something to it.

8          This is an unusual case, or not a common case, where

9     you have 404(b) evidence and the limiting instruction in the

10    pattern charge is tailored to it.  However, we also have an

11    entrapment defense.  And if the jury determines that the

12    defendants committed the acts charged, then the jury is

13    supposed to consider any evidence in the record on the subject

14    of predisposition.

15         What I think of as the predisposition evidence in

16    this case, namely, the prior what we call the bad acts

17    evidence, that's 404(b) evidence and it's also predisposition

18    evidence.

19         I think perhaps what should be done in this case,

20    rather than just giving the pattern charge on 404(b), is to add

21    a sentence or two that says:  As you know in this case the

22    defendants have claimed a defense of entrapment.  If you find

23    that the defendants did do the acts charged in the indictment

24    in this case, then you may consider the evidence of other

25    similar acts in connection with the question -- in connection

1    with the question whether the government has met its burden of

2    proving predisposition under the entrapment law.  How about

3    that?

4         MR. SCARBOROUGH:  I think that's probably an accurate

5    statement of the law, Your Honor.  I think the only thing I

6    would ask is there were allegedly pretty unsavory acts alleged

7    as to each gentleman.  Could the Court also include a sentence

8    that the acts allegedly involving each of them are to be

9    considered only against each of them respectively?

10         THE COURT:  I don't see anything wrong with that.

11    Does the government see anything wrong?  I mean, it's got to be

12    right.

13         MS. WEBB:  The government doesn't have any objection

14    to Mr. Scarborough's clarification and the only clarification

15    that we would add is that rather than just saying that the

16    defendants had a predisposition, to say that whether the --

17    that the evidence can be considered and whether the government

18    has shown that the defendants were predisposed to commit these

19    acts, the offense.

20         THE COURT:  I'm not sure how what you're saying is

21    different from what I said.

22         MS. WEBB:  Just explaining it a little further that

23    it's as to -- not -- it's not predisposition to generally

24    commit criminal acts but that they were predisposed to commit

25    the particular acts they were charged with here.

1            THE COURT:  Okay.

2            MR. SCARBOROUGH:  No objection.

3            MR. SECRET:  And, Your Honor, I would ask the Court

4    to go a little further with respect to predisposition and add

5    the law that existence of a prior related offense is relevant

6    but not dispositive for predisposition.

7            THE COURT:  Well, I think that's legally correct.

8            MR. SCARBOROUGH:  I join in that.

9            THE COURT:  I mean, it is a burden of proof beyond a

10   reasonable doubt.

11           MR. SECRET:  Yes.

12           THE COURT:  Any objection?

13           MS. WEBB:  No, Your Honor.

14           THE COURT:  All right, I'll do that.  I can't think

15   of anything else we need to do before arguments.  Anything you

16   all can think of?

17           MR. SCARBOROUGH:  Your Honor, is there -- if -- is

18   there a final set of instructions yet?

19           THE COURT:  No.

20           MR. SCARBOROUGH:  No, okay.

21           THE COURT:  I mean I'm going to follow the rulings

22   that I made in the charge conference.

23           MR. SCARBOROUGH:  Sure.

24           THE COURT:  But I have not, if you're asking me have

25   I assimilated it into a sequential charge at this point, I have

1   not.

2          MR. SCARBOROUGH:  I may go over the language of the

3   entrapment instruction with some care, if there's no -- if the

4   Court doesn't have any problem with that.

5          THE COURT:  Well, I think, I don't believe any

6   changes have been made in the entrapment instruction.

7          MR. SCARBOROUGH:  I don't think so.  Just want to be

8   sure that was --

9          THE COURT:  If I can find your entrapment instruction

10  here.

11         MR. SCARBOROUGH:  I think it's the last page on mine,

12  Your Honor.

13         THE COURT:  Right, I'm looking to see if yours and

14  the government's are the same.

15         MR. SCARBOROUGH:  I made no changes from the pattern.

16  That's actually a Xeroxed --

17         THE COURT:  Yeah, you all both put in the pattern

18  charge so I will give it verbatim.

19         MR. SCARBOROUGH:  Thank you.

20         THE COURT:  You all ready?

21         MR. SECRET:  Yes.

22         THE COURT:  How much time are you going to us for

23  opening, about?

24         MS. WEBB:  The government will use 25 minutes for our

25  opening.

1          THE COURT:  All right.  Do you want any reminders?

2     Is Mr. Toliver going to take care of that for you?

3          MS. WEBB:  He will and the clock is going to be

4     ticking down, so, yeah.

5          THE COURT:  All right, we're ready.

6          (Jury returned to the courtroom at 10:25 a.m.)

7          THE COURT:  Please be seated.

8          Members of the jury, we are ready now with the

9     arguments of counsel and the government has the opening

10    argument.

11         Ms. Webb, could you pull that podium back just a

12    little bit?

13         MS. WEBB:  Yes.

14         Ladies and gentlemen, what does the evidence show

15    happened in this case?  That in January of 2012, Woodrow Dixon

16    met with a man who he thought was a high-level cocaine

17    trafficker named Tony and he agreed to sell Tony five kilos of

18    cocaine.  But as you heard from Mr. Guyton, Mr. Dixon wasn't

19    able to deliver that cocaine and so Woodrow Dixon came up with

20    a different plan to make money.  And he proposed that he,

21    Mr. Dixon, and his crew, rob Tony with Mr. Guyton's help as the

22    inside man.

23         And once Mr. Dixon made that proposal it was, as you

24    heard Mr. Guyton put it, Mr. Dixon hadn't been a target, he

25    wasn't a target, but he made himself a target.  Because

1    Mr. Guyton told law enforcement, he told Tony, Agent Harvey,

2    who you heard from, about the plan and law enforcement took

3    this seriously.  So they started investigating.

4           What did the investigation show?  What did you hear

5    about?

6           Well, there were meetings.  In April of 2012,

7    Mr. Dixon's giving Mr. Guyton a ride to the airport and he

8    described how he likes to plan his robberies and he said, and I

9    quote, "My shit is calculated."  And he talked about the

10   planning he liked to do:  police uniforms, firearms, maybe even

11   a police dog from Dog-Man, Mr. Wilson, maybe flash bangs, real

12   police stuff.

13          And they would take the cocaine out of the house

14   after subduing the guards and they would go to a hotel, then

15   they'd divide it up among the people who committed the robbery.

16          Now, in April it's just Mr. Dixon and Mr. Guyton

17   talking.  After the ATF got involved the undercover agents were

18   introduced and you heard from each of them:  Agents Stallo and

19   Crawford.  And there were more meetings.  First Mr. Dixon met

20   with Mr. Guyton and Agent Stallo, Shawn, tow truck driver, the

21   nervous tow truck driver, and they planned it out.  Planned

22   further.

23          Then there was another meeting with Agents Stallo and

24   Crawford, Shawn and Toby, and Mr. Dixon was there and

25   Mr. Guyton was there.  And Mr. Dixon had by that point come up

1   with three different scenarios for how this could go down, how

2   this could happen.  And he proposed to them, Mr. Dixon gave

3   those to the two undercover agents, the nervous tow truck

4   driver and his tough buddy, and said we could go in behind

5   y'all, tie you up with them; we could go in before y'all, beat

6   you to the drop; or you go get your little shit, about five

7   kilos of cocaine, you take it on and we wait and hit the house

8   after you're gone.

9        Mr. Dixon's plans, his proposal, three scenarios.

10   Y'all think it over, you let me know which one you want to do.

11        And Mr. Dixon talked about his team during these

12   meetings, the team he was going to provide.  The people I'm

13   running with, I've been running with, Mr. Dixon said.  These

14   people, how did he describe them?  They're not standby, they're

15   ride or die.

16        And he got his team together.  He got them ready to

17   go.  He brought one of them to a meeting with the undercover

18   agents.  Mr. Kirk Floyd, on June 18th, Mr. Floyd showed up at

19   that McDonald's with Mr. Dixon.  You saw a picture of them

20   sitting at the outside of the McDonald's and you heard about

21   that meeting from Agent Stallo, you heard about it from Agent

22   Crawford.  They were both there.  And you heard a part of the

23   recording from it.

24        How did Mr. Dixon describe it?  Bring your party hat.

25   That's what they were going to do a couple days later on June

1      21st, have a party, bring your party hat.

2                What was the question you heard Mr. Floyd ask?  How

3      many are going to be there?  And you heard Agent Stallo respond

4      about the kilos of cocaine that were going to be in the house.

5                And June 21st came.  Mr. Dixon had left town.  He was

6      gone.  But was he gone from the plan?  Had he left the plan?

7                Well, you heard the phone calls on June 21st before

8      the team met up.  Who was on those phone calls?  Mr. Dixon.

9      What was he doing?  Asking Mr. Guyton to go pick up Mr. Floyd,

10     making sure the plan still happened.

11               Who showed up on June 21st?  Mr. Floyd showed up.

12     Mr. Floyd didn't just show up, Mr. Floyd provided the final

13     meeting location.

14               Where did they meet?  Floyd's Plaza in a back room.

15     Mr. Floyd was there, Mr. Wilson was there, Mr. Guyton was

16     there, and Mr. Slack was there.  And what happened inside the

17     room at Floyd's Plaza?  There was a bag and that bag had police

18     gear in it, T-shirts that said Police, a bulletproof vest,

19     handcuffs, police badges, sorts of things Mr. Dixon had said

20     during the planning phases they would have.

21               And the bag had guns in it.  Had a shotgun, it had a

22     .44 Magnum revolver.

23               Mr. Floyd, you heard testimony on this, Mr. Floyd

24     pulled that police gear out of the bag and handed it out.

25     Mr. Floyd pulled the guns out of the bag and handed them out.

1    And Mr. Floyd took, in particular, the shotgun.  He tried to

2    load it.

3         You heard about that a few different ways.  You heard

4    Mr. Guyton tell you about it and you heard Mr. Slack tell you

5    about it and you heard the recording.  You heard Mr. Floyd's

6    voice saying, How do I put these in?

7         You heard the shotgun being racked, you heard that

8    noise.  Mr. Guyton identified it for you, the racking of the

9    shotgun as he tried to put in the bullets and he couldn't do

10   it, he didn't know how at first.

11        So how did he get it loaded?  Because you saw a

12   picture that it was loaded, you saw the picture from the crime

13   scene that the GBI agent took, Agent Norman, that showed that

14   that shotgun had shells in it.

15        Well, Mr. Guyton told you and Mr. Slack told you

16   Mr. Floyd called Mr. Dixon.  Is that corroborated by anything

17   else?  You saw the phone records and you saw the summary chart

18   that Agent Burnett prepared which showed Mr. Floyd calling

19   Mr. Dixon at a time, it lines up with the timestamp that's

20   running at the bottom of the recording, the time that Mr. Floyd

21   is trying to load the shotgun.

22        He got the shotgun loaded, Magnum revolver was also

23   loaded, and they got in an SUV driven by Mr. Guyton.

24   Mr. Wilson sat in the front seat, Mr. Slack and Mr. Floyd sat

25   in the back seat and they drove to a Church's Chicken to meet

1    the two tow truck drivers, the nervous one, Shawn, and the

2    tough one, Toby, to get ready to go to the stash house and

3    commit this robbery.  And you heard what the plan was, they

4    were going to follow in right behind, right behind Shawn, go in

5    the house, take the cocaine, get away in the vehicle and then

6    divide it up.

7          But, of course, once they got to that Church's

8    Chicken and made that last contact with Shawn and Toby, they

9    went into the secure storage facility where Shawn had left the

10   car he needed to put on the back of his tow truck and they were

11   arrested by the law enforcement agents.

12         And the loaded guns were found in the car after the

13   men had been pulled out.  Where was the shotgun?  You heard it

14   was located in the back of the SUV.

15         And where was Mr. Floyd sitting?  In the back of the

16   SUV.

17         And where was the revolver?  You heard it was located

18   in the front seat.

19         And where was Mr. Wilson sitting?  In the front seat.

20         We talked at the beginning what have these men been

21   charged with.  They were intercepted by law enforcement.  They

22   didn't actually rob anybody and Tony didn't exist.  You saw

23   Agent Harvey but he's not really Tony.  They've been charged

24   with, in Count One, conspiracy to commit robbery.  What does

25   that require?

1          First, there have to be -- two or more people have to
2   agree to commit a robbery that's covered by the Hobbs Act.
3   Okay, and we'll talk about what a robbery covered by the Hobbs
4   Act is in just a moment.  But who agreed?  Who are the two or
5   more people?
6          Well, Mr. Dixon and Mr. Floyd agreed.  How do you
7   know that?  Mr. Dixon brought Mr. Floyd to a meeting with the
8   undercover agents and they all talked about the plan at that
9   meeting.  You heard audio of that.  You saw a picture of them
10  sitting there.  The agents testified about it.
11         You also heard testimony that Dixon had previously
12  brought Floyd to a meeting with Mr. Guyton when the agents
13  weren't there where they also talked about it.
14         And who else agreed?  Mr. Wilson and Mr. Slack.
15  Mr. Dixon had previously brought Mr. Wilson to a meeting with
16  the informant, Mr. Guyton, and they talked about the robbery.
17  Mr. Wilson showed up on the day of, he was there.  And
18  Mr. Slack testified Mr. Floyd had told him before the June 21st
19  robbery Dro, Mr. Dixon's, got a job coming.  Mr. Slack agreed
20  to be a part of it.
21         So the evidence shows that Mr. Dixon, Mr. Floyd, and
22  the others agreed to commit a robbery.
23         Second, you have to -- the defendants had to know the
24  goal of the conspiracy.  They had to know what the point was.
25         Well, the tapes show that Mr. Dixon and Mr. Floyd

1   knew the goal of the conspiracy was to rob a man named Tony and

2   whatever armed guards he had of his cocaine and that's on the

3   recordings.  They're talking about the cocaine.  Talking about

4   it in the meetings before, they're talking about it on the day

5   of.  That was the goal.

6          And, third, that the defendants willfully

7   participated in helping to accomplish the goal.

8          Well, Mr. Dixon showed up at the meetings.  He was

9   the planner.  He provided the three scenarios.  He told

10  Mr. Guyton to go pick up Mr. Floyd on the day of.  And

11  Mr. Floyd, he showed up on June 18th, he showed up on June

12  21st.  He provided the meeting location.  He pulled the gear

13  out of the bag.  He handed out the guns.  He coaxed Mr. Wilson

14  back after Mr. Wilson ran off.

15         The agreement had to be to commit a robbery within

16  the definition of the Hobbs Act.  What does that mean?

17         So that means that they had to agree to take someone

18  else's personal property and that they had to do it against the

19  victim's will.  They had to agree to do it against the will by

20  either using force or threatened force or violence.

21         Did they agree to take someone else's property?  They

22  were going to take Tony's cocaine and money.

23         Were they going to do it by force?  Well, they were

24  going to go into the house pretending to be the police and

25  carrying loaded guns.  They were going to handcuff the people

1     that were guarding the property.

2             And it has to be something that the object of the

3     conspiracy, of the agreement, has to be something that had the

4     potential to obstruct, delay, or affect interstate commerce.

5             The interstate commerce, you heard Lieutenant Noe

6     testify about.  It's important here to know that for a

7     conspiracy charge the evidence just has to show that had the

8     objective been accomplished, interstate commerce would have

9     been affected.  Not that it was, but that it would have been.

10            And you heard Lieutenant Noe opine that stealing over

11    five kilograms of cocaine would impact interstate commerce.

12            In Count Two both defendants have also been charged

13    with carrying a firearm during or in furtherance of a crime of

14    violence, or of aiding and abetting someone else in carrying a

15    firearm during and in furtherance of a crime of violence.

16            So what does the evidence need to show on this?

17    First, that the defendants each committed the conspiracy in

18    Count One, the agreement to rob somebody.  Then, second, that

19    the defendant or someone he aided and abetted knowingly carried

20    a firearm.

21            Well, how do you know that each of them either

22    knowingly carried or aided and abetted someone in carrying a

23    firearm?

24            As to Mr. Floyd, you heard from two different sources

25    that Mr. Floyd was the one carrying the shotgun.  He was

1    loading it.  It was in the area of the SUV where he was sitting

2    when he was arrested.  You've heard Mr. Floyd on tape asking

3    how to load it.  And as to the .44 Magnum, you heard Mr. Floyd

4    was the one handing out the guns, that he gave Mr. Wilson the

5    .44 Magnum.

6            Mr. Dixon aided and abetted the others in having the

7    guns.  He says on tape in the June 7th conversation that he's

8    already getting some guns together.

9            Mr. Guyton said Mr. Floyd called Dixon on how to load

10   the gun.  And Mr. Slack said Mr. Floyd called Mr. Dixon on how

11   to load the gun.  And the phone records show that Mr. Floyd

12   called Mr. Dixon at the time he was trying to load the gun.

13   And both witnesses, Mr. Guyton and Mr. Slack, testified that

14   the guns and gear came out of a duffel bag.  And you saw a bag

15   that was found at the scene, has a dry cleaner label attached

16   to it with Mr. Dixon's name on it.

17           How do you know it was in relation to the conspiracy

18   to commit robbery?  Well, the plan was to carry guns into the

19   house.

20           And how do you know that the Mossberg shotgun had a

21   barrel of less than 18 inches?  You watched Agent Harrell of

22   ATF measure the gun with her dowel rod and she said it was less

23   than 18 inches.

24           Count Three is conspiracy to possess with intent to

25   distribute at least five kilograms of cocaine, which is that

 1   two or more people agreed in some way to try to accomplish a
 2   plan to possess cocaine.
 3          Well, again you heard them on tape talking about
 4   kilograms of cocaine.  What did Mr. Dixon say?  Bottom line, as
 5   long as we get 20 kilograms of cocaine.
 6          And you heard on tape, and Mr. Guyton explained that
 7   they went over the plan on the day of what was going to happen
 8   and what was going to be there.
 9          You have to find that both defendants knew about it
10   and willfully joined in it.  And, again, they each showed up at
11   these meetings.  Mr. Floyd showed up on the day of.  Nobody
12   said, I don't want to do this, when they heard what it was
13   about.  And that it was possession with -- it was an agreement
14   to possess with intent to distribute more than five kilograms
15   of a mixture or substance containing cocaine, at least five.
16          Again, bottom line, if we get 20 we're good.  Agent
17   Stallo said on tape, I guarantee 25.  Mr. Dixon said there
18   could be -- you think you saw 50, there could be 75.  Mr. Floyd
19   asked how many are going to be there and Agent Stallo said, at
20   the June 18th meeting, 25.
21          And possess with intent to distribute, 25 kilos of
22   cocaine, they're going to chop it up, they're going to divide
23   it up in a hotel room.  What are they going to do with that
24   cocaine?
25          Finally, Mr. Floyd has been charged with possessing a

1    firearm after being convicted of a felony, which requires that

2    you find that he knowingly possessed a firearm, that the

3    firearm affected interstate commerce and that before possessing

4    the firearm he had been convicted of a felony.

5           Well, Mr. Floyd has stipulated that as of June 21st,

6    2012, he had already been convicted of a felony.

7           And did the firearms affect interstate commerce?

8    Agent Harrell testified that each did, she looked it up and

9    each did.

10          And did Mr. Floyd knowingly possess it, possess the

11   guns?  You'll hear what possession means from the Court,

12   there's different kinds of possession, but you heard the

13   testimony.  Mr. Floyd was handing out the guns and he was

14   holding the shotgun and he was loading the shotgun.

15          Mr. Dixon helped him with that, told him how to load

16   it, talked to him on the phone.

17          Those are the counts the men have been charged with,

18   that's what the evidence supports.  As you look at the evidence

19   think about corroboration, where does it line up?  Where does

20   it -- where is it similar?  Where did you hear the same thing?

21   Thank you.

22          THE COURT:  Before we get started with the defendant

23   Dixon's closing argument let's just take a ten-minute stretch

24   break.

25          (Recess, 10:50 a.m. to 11:05 a.m.)

634

1          THE COURT:  We're ready.

2          (Jury returned to the courtroom.)

3          THE COURT:  Please be seated.  All right, members of

4    the jury, now we will hear Defendant Dixon's closing argument.

5    Mr. Scarborough.

6          MR. SCARBOROUGH:  Thank you, Your Honor.

7          Good morning, ladies and gentlemen.  I've been

8    waiting to get in front of you for a while to talk about this

9    case in summation.

10          I'm going to talk a little longer than Ms. Webb has

11    so far because she gets to divide up her argument.  They have

12    the burden of proof, as I'll talk about in a minute, and so

13    they get to have the last word.

14          So there may be some times when she raises some

15    points and I won't have an opportunity to rebut them and I'll

16    have to rely on your good judgment and reasoning and your

17    collective wisdom to answer the points that she raised.

18          I just want to briefly thank you for your time and

19    attention.  This is obviously a terribly important case.  Yes,

20    for the government, but certainly for my client.  Any decision

21    you make is going to affect my client and his family forever.

22    And I don't have to explain why.  So I thank you for your

23    attention and for the importance that your attention obviously

24    gives to this matter.

25          Some lawyers think the sweetest sound in nature is

1    the sound of their own voice but I try not to be one of those

2    people so I will try not to be too long or too repetitive.

3            Let's start by pointing out that when you look at a

4    painting you usually don't pay much attention to the frame.

5    They're painting a picture but the frame that surrounds it is

6    all crafted by Brian Guyton.  You don't pay attention to that

7    after a while because the conversations and the juicy quotes

8    and the meetings and the recording devices are all after.  But,

9    you know, it's very telling that Ms. Webb started out her

10   opening statement, her opening closing just now, with

11   December -- with January 2012, with this meeting at Chili's

12   that ended up being a noncocaine transaction.

13           It's important for them to focus on that and after,

14   and only that and after, because really one of the main

15   reasons, the main times that the government loses this case is

16   before January of 2012.

17           And that's because this is an entrapment case.  This

18   is an entrapment case.  The government created the crime and

19   Mr. Dixon did not have a predisposition to commit the charged

20   crimes.  That's important.  That is the defense we put in front

21   of you.

22           Now, that doesn't mean we concede any element of any

23   of the crimes and so you still would need to determine beyond a

24   reasonable doubt that all the elements of the crimes are

25   satisfied, okay, but beyond that they have to disprove beyond a

1    reasonable doubt that Mr. Dixon was entrapped.

2         Let me go ahead and talk about entrapment now because
3    there's some important things to know about it and you'll get
4    an entrapment instruction as part of the final instructions
5    from Her Honor.  And I want to address with you the when, what,
6    and how of entrapment.  When, what and how.

7         Entrapment happens when the government or somebody
8    acting on behalf of the government, including an informant,
9    is -- induces somebody to commit a crime that they did not have
10   a predisposition to commit.

11        Now, not just a disposition, a predisposition.  So
12   the when of entrapment is that the disposition, the
13   predisposition, the tendency or the desire to commit the
14   charged crime has to have existed before they started inducing
15   him, before.  Not after.

16        Now, the what of entrapment is they have -- they have
17   to show that he had a predisposition to commit the offenses
18   that you are considering.  Not just that he had sort of a
19   general notion of I'll commit a crime every once in a while.
20   Just to take some examples that have nothing to do with this
21   case, it's not about whether he had a predisposition to commit
22   tax fraud or manslaughter or something like that.  It has to be
23   that he had a predisposition to commit the particular crimes,
24   particular kind of crime that's in the indictment, the ones
25   that you're actually considering.  So that's the what.

1           And the how is that they have to disprove it, again,

2    beyond a reasonable doubt.  This is not Mr. Scarborough's crazy

3    idea; this is the law.  This is the law.

4           The reasonable doubt, beyond a reasonable doubt

5    requirement applies to every element and to our defense and

6    it's important, and I dwell on it just a little bit, because

7    there are some things in this case that aren't helpful to us.

8    I will say that openly.  There's no hiding anything.  My client

9    said some stuff that doesn't sound good.  He said a lot of

10   things that didn't sound good, although you were treated to a

11   greatest hits set of excerpts of things that didn't sound good.

12          But since there's a lot that's murky here, a lot

13   that's incomplete, a lot that you can't be sure of, what the

14   law requires you to ask each time is why didn't they clear it

15   up.  It's not about why didn't Mr. Dixon say or offer or prove

16   anything.  If there's a doubt, why didn't they resolve it?  If

17   something's murky, why didn't they clear it up?  If something's

18   doubtful, why didn't they establish it through competent

19   evidence?  That's not me, that's the law saying that's what

20   you've got to do.

21          And it's important.  It's one of the reasons we

22   aren't the People's Republic of China where the juries are told

23   what to rule and how to rule and how fast to do it.  You get to

24   decide.  We stand up when you all walk in, just like we stand

25   up when Her Honor walks in; she's a judge, so are you.  And

 1    that's not me sweet talking you or giving you some nickname,

 2    you truly are judges whose findings are binding on everybody.

 3            And you get to demand, you must demand of them that

 4    they clear up doubts, they put light on anything that's dark or

 5    murky.  If they don't, the answer is not guilty, and that

 6    includes entrapment.

 7            Now, who is this fellow that crafted this frame

 8    around this picture that they painted?  He is a desperate,

 9    panicked, two-time federal loser with an agenda.  He almost

10    admitted it, except did you notice something about Mr. Guyton?

11    He can't admit much of anything.  You know, the thing is we

12    didn't -- we just don't understand, yeah, he pled guilty to

13    such-and-such but it really wasn't like that.  Did you notice

14    that?  Everything's minimized, nothing was quite the way we

15    thought it was, just because he went into court years ago and

16    raised his hand and swore before a judge that he had done

17    certain things, now he wants to back away.

18            Yet nothing was -- no, no, no, I wasn't doing that

19    scheme with defrauding the courts about faked auto titles, no,

20    no, that was somebody else that I dealt with.  And what

21    happened to me and my money laundering case, it could have

22    happened to anybody.

23            See, he's always distancing himself.  The man's a

24    hustler, okay?  This is a hard world.  Sometimes it's kind of

25    good to be a hustler because you can take care of yourself but,

1    boy, is he taking care of himself.  He knows how to do that.

2    And it wouldn't matter except that he is such a pillar of what

3    they've got.

4           What else do they have early on besides Brian Guyton,

5    who said he wasn't a target.  He said, conveniently, he made

6    himself a target.  Well, you know what, who was talking to him

7    in unrecorded conversations for months?  Including well before

8    January of 2012.

9           This Defendant's Dixon 2, the documents pertaining to

10   his cooperation with the IRS before January of 2012, you know,

11   we put this in evidence.  There's some stuff in here that

12   doesn't sound good for us but it's in evidence and we're not

13   afraid of it.

14          First of all, look how busy the gentleman has been.

15   I don't know at what but I know he sure knows how to help

16   himself.  He sure knows how to get time off his sentence.  I

17   don't know, you'll never know what he did for that, you'll

18   never know how many unrecorded meetings he talked about or made

19   up or crafted, how many other cases he made, how many he's

20   looking to make.  We'll never know that.  But yet this guy,

21   that Agent Burnett doesn't trust with a tape recorder, is the

22   key to all this.

23          Conveniently he says that this fellow said, Let's not

24   do a drug deal, let's do a robbery.  I'm sorry, but I think

25   that's sort of important.  I think it would be nice, especially

1   during a period when he claims in his paperwork that he's

2   already recording everything that Mr. Dixon -- every meeting

3   he's had with Mr. Dixon, I think it would be awful nice if we

4   had that on tape instead of just him saying so.

5           The man's not a fool.  He knows how to help himself.

6   He knows what he needs to do.  He knows what he needs to make

7   happen or make appear happen.  And, you know, even if he was

8   predisposed to do a drug deal, and I don't think he was, I

9   don't think the evidence shows that, but even if he was, that's

10  not predisposition to commit a robbery, not a violent offense.

11          But what's happening?  He told you he was getting

12  panicky.  He needed to make some money, he was worried about

13  having to report.  Joe Thomas told you he was weeping and

14  suicidal over the need to turn himself in.  Guy's got kids.  I

15  almost don't blame him.  If he hadn't come up with a lot of BS,

16  frankly, pardon me, against my client, I wouldn't blame him,

17  the man's trying to help himself.  He's a hustler, that's what

18  he does.  That's why he's good at selling those cars.  That's

19  an informal business, it's about relationships and deals you

20  can make and getting along with people and making things sound

21  good.

22          So I wouldn't blame him except that he's seeing --

23  what? -- in January the sale doesn't go through from Chili's.

24  In March the buy doesn't go through, the buy of cocaine that

25  Mr. Dixon is supposedly going to do, according to Mr. Guyton.

1            You know what, Agent Harvey, the government's first

2    witness, he didn't know anything about that.  But Mr. Guyton

3    admitted in March or April he was involved in trying to get my

4    client to buy some cocaine.  So January didn't work for

5    selling.  March or April didn't work for buying.  We got to

6    come up with something.  The clock's ticking, I'm about to have

7    to turn myself in, I've got to make some cases.

8            What did Mr. Secret establish with Mr. Slack, I

9    believe?  He established that good faith efforts by these

10   cooperating witnesses that don't produce any results don't get

11   them any credit.  They don't get a break from the government

12   just because they meant to be helpful.  They get a break from

13   the government if they make cases, if they get results, if they

14   bring people in or help them bring people in.

15           So he can't just say, you know, I sure tried.  He's

16   got to be able to point to I helped you make this case and I

17   helped you make that case.  So all of a sudden this fellow is

18   supposedly talking about robberies.

19           What else is there besides his word for so much of

20   that early stuff?  Not much.

21           He understands, as does Mr. Slack, he understands

22   that the government only decides whether he's provided

23   substantial assistance.  Even the Court can't reduce his

24   sentence on that basis until and unless the government opens

25   that door with one of those motions.  So they get to decide

1   whether the judge can walk down that road at all.   Okay?   Judge

2   can't force it.   Judge can't force it out of sympathy or sense

3   of fairness or anything.   They have to do it.   They have to do

4   it.

5          And what am I asking -- what am I saying about these

6   fellows, about Guyton, yes, also Mr. Slack?   Am I saying these

7   folks, that agent got in a room and said let's cook up some

8   stuff, let's frame somebody, let's violate some people's

9   rights?   I'm not saying that and I don't think that happened

10  and it's not necessary that that be what happened in order for

11  an entrapment defense to be found.

12         What I'm suggesting to you is that Mr. Guyton, who is

13  quite the wheeler-dealer and pretty articulate, and Mr. Slack,

14  who's college educated and working for a mortgage company and

15  interviewing for jobs with Wells Fargo, I'm suggesting to you

16  that they aren't fools.   They know what's needed.   They know

17  what they need.   They know what will be deemed to be helpful.

18  They hear what the agents and the prosecutors are assuming, in

19  part, and mostly because Mr. Guyton planted that seed in the

20  first place, and they're able to craft.   It's so easy to say,

21  oh, yeah, he knew too, he did it too, he planned it, when you

22  know, because you've made him a target, that he is a target.

23  So easy to do that when that's your agenda.

24         There's a little thing, I'll admit it was sort of a

25  little thing but we pointed out with Mr. Slack, he meets with

1    the government twice within the six-day period.  First time he

2    never met Mr. Wilson until the day of the operation, the 21st.

3    Six days later, oh, no, I -- he said at the time I met him at

4    the Burger King.  Well, he tries to back off that on the stand,

5    Oh, I had seen him the first time but, you know.  But that's

6    not what he had said.

7            The point is these people understand what they need

8    to say.  They come to understand what they need to say in order

9    to make these folks happy.

10           When the proof of predisposition relies so

11   exclusively on the word of these folks I think that's

12   reasonable doubt as a matter of inescapable logic.  How can you

13   trust these folks beyond a reasonable doubt as to those things,

14   as to the early pre-January 2012 question of predisposition?

15   We're going to rely on that?  On them?  On Guyton?

16           I mean, all due respect, I wouldn't want him in my

17   house, not when the silverware is out.  And yet all of this is

18   to be hung on his word.

19           Now, I said we're not going to hide or ignore.  Yeah,

20   I hate those transcripts.  I'm not going to pretend about that.

21   And there's some scary sounding stuff there.  But a couple of

22   things.

23           One, again, who made the frame for the picture?  Who

24   made the frame for the picture?  Brian Guyton did.  He in his

25   sole discretion is hitting that button or turning it off when

1    he feels like it.

2            And you heard the greatest hits of Mr. Dixon saying

3    the scariest things that he might have said in hours and hours

4    and hours and hours and hours of conversation, but April 4th,

5    on the way to the airport, what was said before?  I don't know.

6    You don't know.  We can't know.  But it could have been

7    anything, including, notably, something that Mr. Guyton

8    encouraged or instructed or created, some kind of ruse, some

9    kind of puffing, some kind of trying to sound like -- pardon

10   me -- a bad ass in front of your friends.

11           Folks, go ahead and convict if you've never sat down

12   with your buddies and had a little fish that you caught turn

13   into Moby Dick because everybody talks trash for their buddies,

14   you know.  It's in the nature of friendly relationships to

15   magnify things, to embellish stories.

16           And that's, by the way, one of the ways you can tell

17   Mr. Slack is not truthful.  He says he's never done that and

18   never would.  Come on, man.  He didn't even want to admit he

19   wanted a sentence reduction.  The guy's so guarded and so

20   downcast and so miserable because it's hard to lie on your

21   friends just to keep your own rear end out of prison or to

22   minimize your time in prison.  That's what you got, that's what

23   they've got.

24           Now, there is no argument, no denial from the

25   government that they created the crime.  Everybody conceded.

1    Nobody's going to argue that they didn't facilitate this and

2    really bring it into being.  Yes, it's true, as Agent Burnett

3    said, they didn't provide weapons.  But they sure provided what

4    we have agreed, what they agreed is a necessary ingredient,

5    which is an opportunity to do this.  So inducement was clearly

6    there and it kind of leaves us with just the question of

7    predisposition.

8            But it's worth paying attention to how they did what

9    they did and how energetically they did it.  Because they were

10   on to these folks from early.  They had decided these people

11   would be involved in a crime and that was the agenda.

12           Brian Guyton knew it, he knew what he needed to do,

13   he knew what he needed to pull off and make happen.

14           You got Agent Stallo being a little nervous or a lot

15   nervous.

16           You also, by the way, have Mr. Dixon not showing up

17   on the 13th.  Maybe because this isn't his thing and he's

18   trying to just kind of fade out but we don't have a recording

19   of that, conveniently.

20           I mean, you know, Google Maps, you can get on that

21   computer and Google Maps can tell you what's on the deck

22   outside my bedroom outside my condo.  So please don't tell me

23   the United States government cannot reliably record what's

24   going on in these interactions.

25           But, no, no, we're all leaving it all up to Brian to

1   decide what shall be preserved and what shall be hidden.  And

2   so you don't have a picture that you can rely on unless you

3   look at that frame because the frame distorts.  If you've got a

4   whole big panorama but you've got a frame around it that's only

5   making you look at a little corner, you just know about a

6   little corner.

7           Agent -- let's see -- Toby, I always forget the

8   gentleman's name, I'm sorry, Agent Crawford said, Yeah, I was

9   pushy, I was the pushy one.  And you heard him say, Screw him,

10  screw this Tony guy, yeah, he's not treating my friend right,

11  all this stuff, pushing and pushing and pushing along.  And I

12  bonded with Mr. Floyd over this, I looked him in the eye and we

13  had a wink because I was going to make this happen, it was

14  important.

15          Yeah, they always have that escape clause, hey, if

16  they hadn't wanted to do it that was fine.  But he admits he

17  was pushing and pushing and pushing.

18          There was a Supreme Court case decided this summer, I

19  think in June, and one of the Supreme Court justices was

20  talking about the right to a jury trial and he was quoting some

21  older cases and he said that juries protect the accused against

22  the overreaching of the state and against the desires and

23  beliefs of the government.

24          So your constitutional job is precisely that and I

25  think that a jury's role is most important in an entrapment

1   case because you are a check on the desires and beliefs of the

2   government.  They thought he was fishy because their guy

3   working off a beef told them he was fishy and so they set about

4   making it happen.

5            You are the check on that.  And I can't tell you how

6   to feel and it's not relevant how I feel.  But, you know,

7   government has a tendency to do this, especially where

8   technology's involved.  You know, the reason the National

9   Security Agency is listening to all your phone calls now, or at

10  least taking down the numbers, all of them, is because they

11  can.  They can so let's do it because they mean well.  They're

12  the government, they've got the technology and they mean well.

13  They're trying to keep us safe, they're trying to protect the

14  community.  So something that they can do becomes something

15  that they ought to do.

16           You know, Agent Crawford said, I think it was -- no,

17  it was Agent Stallo.  He said, you know, reactive tactics

18  haven't been very productive.  So these stings that we do are a

19  proactive method of law enforcement.

20           That is a remarkable statement.  And I didn't make it

21  up, I didn't even invite that phrasing.  He said it.

22           The reactive method of law enforcement, in other

23  words, actually responding to crimes, is not productive enough.

24  They got to get proactive.  I joke around with some of my

25  defense attorney friends about let's just have preindictment

1  sentencing.  That would be awfully efficient, desperately

2  unfair but awfully efficient.

3          You see, what they can do they start to think they

4  must do and they start to think it's appropriate to do.  And

5  it's a trap for well-meaning people because they do mean well,

6  they do want to keep the community safe, but haven't they lost

7  their way?  Haven't they picked the wrong way to keep the

8  community safe by creating these crimes?  Creating these

9  crimes.

10          Well, they needed a predisposition so here comes

11  Mr. Slack with some 2009 incident.  You see how it fits?  You

12  see what the gap was?  We're not so good on predisposition,

13  we're shaky, we've got Brian Guyton and he's clearly subject to

14  credibility problems.

15          So Mr. Slack figures, when he gets arrested with the

16  others and realizes what they need, it would be really helpful

17  if there were some episode I could testify to that would paint

18  him as predisposed, so let's do a robbery back in 2009.

19          Folks, the man couldn't look me in the eye.  Her

20  Honor had to keep saying lift up your microphone.  She might as

21  well said lift up your head because it was all like this.

22          And my guy supposedly, Mr. Dixon supposedly is

23  driving his own car to his friend's house to rob him.  And then

24  somebody, I think on direct examination he initially said

25  Mr. Dixon is yelling where's the money, et cetera, et cetera.

1          Now, there's a reference by Mr. Dixon on the
2     transcript to something related to that but even there when
3     he's puffing and goofing around and making himself sound big
4     talking about stuff that he didn't do he says, Oh, I just got
5     some dope and money.
6          Mr. Slack told you nothing was recovered in that
7     incident.  It's another reason not to believe him, because he
8     didn't get any dope or money in 2009.  He didn't get any dope
9     or money in the mere driving by a residence a few weeks before
10    the arrest, supposedly with Mr. Dixon.  Man, if my guy is a
11    robber he sure is a poor one.
12         But Mr. Slack, who says he's not even that good of a
13    friend of Mr. Dixon, wants you to believe that, oh, yeah, they
14    did this before together.  They did this 2009 operation.
15         Oh, and I recognize the gun.  You know how many
16    sawed-off shotguns there are in the United States?  There's
17    nothing distinctive about that gun but it sounds good.  Oh, I
18    recognize that on June 21st because I'd seen that very one
19    before.  I'd seen that very one before.
20         So much doesn't add up.  So much of even the
21    conversations that were taped, the subset of the many
22    conversations that you are able to hear, so much of it doesn't
23    fit either with what actually happened on June 21st or with
24    good common sense.
25         And a lot of it was goofing around.  This stuff, I

1    think it's a bizarre little fact, you never know what's going

2    to come up in a trial and repeated three or four times but this

3    silly thing about heating up the badge and then putting the

4    imprint on their forehead, I mean, they were goofing around.

5    I'm not sure what that was about, you can't know what it was

6    about, but it sure isn't proof beyond a reasonable doubt of

7    predisposition to do anything.

8            And whatever the reason for trying to make himself

9    sound big or scary or dangerous, it's not proof of

10   predisposition occurring before the government started working

11   on him.  It's just not there.  It's not there.

12           Beyond everything else, this mastermind, this, you

13   know, career stash house robber is going to -- who, by the way,

14   did you see the car?  No offense to his fiancée who owns it,

15   but, you know, it's not a drug dealer car, it's not a big

16   robber car.  Where's the opulence in the man's lifestyle?  You

17   can consider that.  I mean, come on.  Again, if he's robbing

18   stash houses where is it all going?  There's no bling there or

19   whatever you want to call it.

20           But so much of it doesn't match up with what actually

21   happened, including the so-called mastermind not even being

22   there, not just on the 21st but four days.  If he just arranged

23   not to be there on the 21st that might be kind of clever.  But

24   everybody agrees he wasn't coming back for four days.

25           Now, this is a business, apparently, where friends

1    and associates double-cross friends and associates.  Do you

2    think he would stay out of town taking pictures for Kem during

3    the time that the money and the drugs were being divided up?

4    And it's 27- or $29,000 per kilogram?  Or do you think he'd be

5    there to get his spoils, his portion?

6            So much of what was bragged about, talked about,

7    joked about, conferred about, didn't happen.

8            You may have doubts.  But, again, they have to quell

9    your doubts.  They have to extinguish your doubts if they're

10   reasonable doubts as to the elements of the offense and as to

11   disproving entrapment.  All beyond a reasonable doubt, all a

12   hefty standard, all one that you're required to hold them to.

13           I may have overpromised you one thing in my opening

14   statement.  I remember saying on Monday that you were going to

15   find him not guilty and that you would be comfortable doing so.

16   I believe that your honest and careful, collective review of

17   the evidence will lead you to find Mr. Dixon not guilty.  But,

18   honestly, the rough truth is it doesn't matter whether you're

19   comfortable doing so.  You may think that it's 51 percent,

20   sure, that this happened the way the government says.  You may

21   have doubts.

22           But the law's clear, your duty's clear, your

23   constitutional historic role in this is clear, to check

24   overreaching, to tell them stop when they're doing it the wrong

25   way, when they're creating crime.  Whether you're comfortable

1    or not after the verdict is rendered, there's only one verdict

2    that the law will allow.  Thank you so much.

3            THE COURT:  Now we'll hear Defendant Floyd's closing

4    argument.

5            MR. SECRET:  Good morning, ladies and gentlemen.

6            THE JURORS:  Good morning.

7            MR. SECRET:  As with Mr. Scarborough, I also want to

8    take this opportunity to thank you for your service.  Your role

9    in this process is critical, essential, and it is your

10   participation in the process of the determination of an outcome

11   like this that makes our country different.  It makes our

12   Constitution different.  It makes our democracy different.

13           This case is about a two-time federal convicted felon

14   artfully and skillfully ensnaring and entrapping two

15   individuals and the government let it happen.

16           And Mr. Floyd is pleading with you for your

17   protection from that kind of government activity.

18           At some point during the course of this trial -- and

19   I'll try not to be repetitive, I commend Mr. Scarborough, he's

20   excellent -- he said that -- I say his words sure sound sweet

21   to me.  I'm going to go over with you a few things, some things

22   about the law.

23           Your role in this case is to take the law that this

24   judge is going to instruct you, she's going to give you

25   specific instructions about entrapment, about how you look at

1    the testimony of witnesses, about how you measure or decide to

2    listen to an accomplice, how you are to consider a plea

3    agreement when listening to a person testify, and then it is

4    your responsibility to take that law that she instructs you and

5    apply it to these facts.  You are the trier of fact in this

6    case.  As is indicated by Mr. Scarborough, you are the judges

7    of the facts in this case.

8         One of the things that this judge is going to

9    instruct you on is the burden of proof.  And she's going to

10   tell you that the burden of proof is heavy.  It's like a

11   two-ton block on the back of the government.  It's like

12   holding, when you see that picture of the Atlas holding the

13   world on its back.  The burden of proof is heavy on the

14   government.  And it never shifts to this side.  It always

15   remains right here.  Never shifts to the side of the defendant.

16   And whenever you have questions that have not been answered it

17   is the duty of the government to answer those questions.

18        But, of course, the judge will further tell you that

19   that doubt does not mean all possible doubt.  It's not an

20   unfair burden, it's heavy, but not all possible doubt but it's

21   a doubt based on reason.  And it says that, when it talks about

22   and tries to give you a definition of what that is, it says it

23   is a doubt that when you make the everyday decisions in your

24   life cause you to hesitate.  That's doubt.

25        If you had to go to the doctor and the doctor told

1    you that you needed surgery for a stomach issue or that you had

2    cancer and you needed some part of your body removed and you

3    listen to him very intently but yet still in your gut there was

4    some doubt, there was some hesitation, and it caused you to go

5    get a second opinion from somebody else, that hesitation is

6    doubt.

7         Is there anything in this case that would make you

8    hesitate?

9         Brian Guyton should not only make you hesitate; he

10   should make you stop.  This is a man who was convicted of money

11   laundering in, I believe, 2000.  Of course, he has said to you

12   that he really doesn't see that he did anything wrong, you

13   know, I'm really not sure of what I did here but I went to

14   prison and I served 30 months.  And apparently I thought I

15   learned a little bit more in prison, maybe I learned how to do

16   it better because I came out and I done the same thing and I

17   was convicted again for the same thing and I pled guilty for

18   the same thing.

19        But even at that offense he comes to you, before you,

20   sits on that witness stand and tells you I'm not sure I really

21   did anything wrong.  The only thing I did was sell this car to

22   them, I didn't think I was doing anything wrong as long as I

23   was not involved in the sale of the drugs.  But he admits to

24   you he knew that they were selling drugs.

25        He could not be honest and forthcoming with you about

1     anything.  And this is who their case rests with.

2          Remember that entrapment is when the government

3     induces or persuades a person to do something.  The government

4     or government agent, and it was clear he was signed up as a

5     government agent, both by IRS and ATF.  It was clear that he

6     had a tape recorder issued to him by IRS or someone, ATF.  It

7     was clear that he had control over the button of that tape

8     recorder.  There was some dispute between Officer Burnett and

9     Mr. Guyton about the nature of this device.

10         Mr. Guyton, who had that thing in his pocket I guess

11    for several months, was very clear about how it operates, that

12    all he had to do was push a button and it started.  Mr. Burnett

13    talked about another kind of device that he would have given

14    Mr. Guyton had he been the one to distribute it but he wasn't.

15         He turned that device on and off at his pleasure.

16    And this is a man who knew what he was doing.  He knew what he

17    was doing.  He knew what he needed to do to reduce his

18    sentence.  He had been through this federal process twice.  He

19    clearly understood and quite intimately understood the details

20    of that plea agreement.  He knew clearly what substantial

21    assistance means.

22         And remember, it was supposed to be, as has been

23    indicated, first a purchase of drugs.  Didn't work.  Then it

24    was supposed to be a sale of drugs.  Didn't work.

25         So the skillful, crafty criminal, this liar, decides

1    that he is going to come up with another plan and he implants
2    the idea, we argue, in the head of Mr. Dixon to come up with
3    this scheme to rob the stash house.  And then the ball gets
4    rolling.  That is the conversation that is quite conveniently
5    not recorded.
6              And if you have doubts about that conversation, if
7    you wonder about that conversation, if the absence of a record
8    of that conversation makes you hesitate, that's reasonable
9    doubt.  That means that the government has not carried its
10   burden of proof.  And how can it not?
11             And not only in that situation with Mr. Dixon but
12   also in the situation with Mr. Floyd.  When he first meets
13   Mr. Floyd, remember this is at the Quik Trip service station,
14   supposedly an impromptu kind of visit, and remember that he
15   said he had the tape with him, said it was in his backpack.  He
16   had his children in the car.  And this is when the conversation
17   allegedly happens when he says that Mr. Kirk Floyd is all
18   gung-ho about it, as he's driving his nice car with his ski
19   jets on the back.
20             That is conveniently not available to you.  That is
21   conveniently missing.  Both conversations, they are initiated
22   into this process, which we contend they're lured, induced and
23   persuaded by Mr. Guyton, are not available to you.  And the
24   only witness that you have, the only evidence you have, the
25   government concedes, comes from the voice of Mr. Guyton

1   himself.  A car salesman.  A used car salesman, by the way.

2            And, listen, I don't think any of you believe it.  I

3   think there's got to be doubts in your mind about whether or

4   not this man is telling the truth.  And you search, don't you?

5   You search someplace else for something to corroborate what

6   they said happened, something else.  And with respect to the

7   initial conversation about how this gets under way, both as to

8   Mr. Dixon and Mr. Floyd, it is not there.  That, ladies and

9   gentlemen, is reasonable doubt.

10           Has he been honest and forthcoming with you?  One of

11  the things that -- you know, you are the judge of the

12  credibility of a witness.  Whether or not you believe part of a

13  witness's testimony or all of his testimony is up to you.  But

14  there's certain things you can use to determine whether or not

15  that witness is believable, okay?  And one of those things is

16  his manner of testifying.  And one of those things also, which

17  brings, of course, the issue of Mr. Slack, you know, the body

18  language of this young man.

19           He was here to get his deal.  He was here to make his

20  bargain.  That's it.  No other motivation whatsoever to bring

21  this man into this courtroom other than to get his bargain, to

22  get his deal.  And he knew it.  He understood what he was

23  required to do.  Okay?  And he says that, Oh, I just want to

24  tell my side of the story.

25           He did a little bit more than that, didn't he?  He

1    didn't just tell his side of the story about what happened

2    here.  He came up with some stuff about 2009 and then he came

3    up with some more stuff about some incident in North Carolina

4    that he claims that Mr. Floyd told him either in Atlanta or

5    Jacksonville.  Does that make a difference?

6              You know, I remember when I first started practicing

7    law a long time ago there was a plaque on the judge's bench

8    that said tell the truth and you never have to remember what

9    you said.

10             And that's so clear with Mr. Guyton, you know.  Had

11   he been telling the truth about whether it was Atlanta or

12   whether it was Jacksonville, you wouldn't have to remember what

13   you said.  The truth sort of burns and etches in your brain.

14   It's the lie that kind of floats around in there someplace and

15   has to try and find a way to root itself.

16             And then he said, remember, about the guns?  This is

17   Guyton, he can't take responsibility for anything.  You know,

18   they found a gun in his master bedroom.  That wasn't mine, that

19   belonged to my tow truck driver.  And then they found a gun in

20   his kitchen drawer.  That wasn't mine either.  And then a gun

21   in the Public Storage that he had.

22             Do those things matter?  Yes.  Why lie?  And if he

23   lied about that, can you believe him about the most important

24   things in this case?  I contend not.

25             In that charge where the judge is going to talk to

1    you about the credibility of witnesses she's going to tell you

2    a few things.  She's going to say, you know, did the witness

3    impress you as one who was telling the truth?  Is that your

4    impression of the person?  Okay?  Is that the impression that

5    you get of Guyton and Slack, that they were telling the truth?

6              Did the witness have a particular reason not to tell

7    the truth, to embellish or to push their -- to push out a story

8    that convicts Mr. Dixon and convicts Mr. Floyd?  It is what is

9    called substantial assistance.  Substantial assistance leads to

10   a reduction in sentence.  Do they have a reason to lie?

11   Absolutely.

12             Does a witness have an interest in the personal

13   outcome of the case?  Yes.  That speaks for itself.

14             And the judge is going to tell you even further, when

15   you talk about an accomplice, this is Mr. Slack, or a

16   co-defendant in the case testifies, that the law tells you to

17   be especially careful.  This is what the law says, be

18   especially careful when you listen to their testimony.

19             It also says the same thing when you talk about a

20   person who testifies pursuant to a plea agreement.  The law

21   says be especially careful.  You say why does someone say that,

22   what is the reason for that?  Because the law knows and

23   understands that there are reasons for these persons to lie.

24   There are reasons for them to slant their testimony, to benefit

25   themselves.

1              So look at it carefully and if you can't find

2    anything to corroborate the story, how can you believe them?

3              And remember the two most important moments in this

4    case -- we're talking about entrapment and we're talking about

5    inducement and persuasion -- is the first time that he met

6    Mr. Floyd and the first time that he met Mr. Dixon, those are

7    the two most important moments.  We have no record of that and

8    the only evidence we have of that is the testimony of Brian

9    Guyton, period, a person who is not worthy of belief.

10             Even, it was interesting to me, that both Agent

11   Stallo and Agent Burnett, both expressed concern, didn't they,

12   about a confidential informant having a tape under his control,

13   didn't they?

14             Agent Stallo said, I would never do that, I would

15   never give him that.

16             Why?  For this very reason, for this very reason, it

17   fits the facts of this case perfectly, for this very reason,

18   because you give him the control button.  Security, security, I

19   don't believe that.  Security of the informant is secondary.

20   What you have to control is the integrity of the information.

21   You have to make sure the information that you're getting is

22   accurate and true if you care, if our government cares whether

23   or not it's accurate and true, that's what they're concerned

24   about.

25             Agent Burnett said that he would never give them one

1    either.  He would have only one that he could control, only the

2    type of recording device that he cannot cut off.  He knows the

3    possibilities.  And then when I asked him, remember, why, you

4    don't trust him?  And he said a convicted felon?  Absolutely

5    not.

6         Why should you?  Why should you?  And why is the

7    government asking you to when they don't trust them themselves?

8         Brian Guyton knowingly did what he had to do to

9    invoke his get-out-of-jail-early card.  The evidence indicates

10   a depressed and suicidal person, transformed a drug deal into a

11   planned home invasion.  He sold the deal just like he would

12   sell a car.  Remember he talked about the $250,000,

13   potentially.  I think at one point he even talked about a half

14   a million dollars, potentially.  He talked about the multiple

15   number of kilos that could be in the house.

16        And then remember also that when Agent Stallo, I

17   believe, he said, or one of the agents, I can't remember but I

18   think it was Agent Stallo and another who talked about the dos

19   and don'ts of a confidential informant.  Remember one of the

20   things that they said is that the confidential informant does

21   not provide any materials.

22        Well, in this instance he did provide a car, didn't

23   he?  He did have a mask.  And you remember during the course of

24   the conversations he was saying -- this is a part of his way to

25   induce him, to make sure that, you know, you get into this --

1    I'm going to get whatever you need, whatever you need I'm going

2    to get that for you.  Remember at some point someone says, I

3    don't have any guns.  Okay?  And he said, I got the money for

4    that.

5            At some points he talks about, you know, need a

6    rental car.  I'm going to get that.

7            He is intricately involved in the planning and the

8    details of this thing.  I mean, you know, when you talk about

9    entrapment who comes up with the idea of the tow truck?  Who

10   comes up with the idea of the stash house?  Who comes up with

11   the idea of bringing in a second person?

12           And then you have, on the day of the offense,

13   remember what Slack said?  And he was unequivocal about it.  He

14   didn't have any hesitation, there was no doubt in his mind as

15   to who was in charge that day.  It wasn't Kirk Floyd.  It

16   wasn't Dixon.

17           The person that he said that was in charge that day

18   was Guyton.  He was giving the instructions.  This is how it's

19   going to go down, this is what we need to do, this is what's

20   going to be here.

21           And then he not only did it once but then remember

22   Wilson, Dog-Man came in late so he did it again.  He wanted to

23   make sure, Mr. Guyton, that this thing happened.  He was

24   driving this engine.

25           And there are a couple of times that make you wonder,

1    doesn't it, as to why does he continuously say on that day, on

2    the 21st, why does he continuously say we just might have to --

3    we can just drive by there, see what it looks like.  We don't

4    have to do it this time.  This can just be a test run.  Why

5    does he continuously say that?  Does he see doubt?  Does he see

6    reluctance on the part of those participants?  Does he see them

7    try to back out?  Does he feel that?  And if he does, the only

8    thing that he wants to do is make sure he gets them in that

9    car.  He's driving this train.

10         When they get to the place they don't have on any

11   uniforms.  He gets them in the car.  There were clear

12   indications at the scene when they first get to the storage

13   unit -- wasn't there? -- that some people want to back out,

14   say, I don't know about this.

15         He drives them on anyway.  He has a motive.  He has a

16   goal and it's the reduction in his sentence, that's it pure and

17   simple.  There's no other reason why they're here.  They're not

18   police officers.  They're not having fun.

19         Then the gun count and who bought the guns.  I don't

20   think there's any evidence in this case at this point as to who

21   bought those guns in there.  I believe Slack says that when he

22   got there the guns were already there.

23         There's no evidence at all that Mr. Floyd ever had a

24   Glock pistol.  And I believe when you read this indictment

25   you'll see that it says, as far as the weapons are concerned,

1    that they had a Glock and a pistol and a shotgun.  And that
2    Mr. Glock [sic] never touched the Glock.  There's no evidence
3    of that.
4            Now, you know, I mean I could make an issue of this
5    Mossberg shotgun.  I'm going to leave it up to you as to
6    whether or not they proved that that gun was 18 inches long.  I
7    mean, in my mind, I'm talking about what the law is, it's
8    technical but this is the law, period.  I mean, I never saw a
9    ruler that measured that gun in your presence.  I never saw
10   that.  I never saw them put a yardstick next to that gun and
11   say this gun was 18 inches, I never saw that.  But I did see
12   them put a stick down there and somebody tell you that that was
13   18 inches.  But, I mean, I'm just telling you technically what
14   the law is.  I never saw that so there is a question in my mind
15   as to whether or not this shotgun is in fact 18 inches.  That's
16   for you to decide.
17           So I've gone longer than I normally go and me and
18   Mr. Scarborough have been over these facts.  I'm going to rely
19   upon your collective memories as jurors to determine what the
20   evidence is in this case.  You've been attentive and I thank
21   you and appreciate that from you.
22           As I indicated earlier when we first started here,
23   you know, I thought Brian Guyton is a scam artist.  I think he
24   is.  That's what he's been all his life, that's his MO, that's
25   what he does, that he got caught in the scam in 2000, got

 1    caught in a scam in 2010, but continues to scam.

 2            Certainly scammed Mr. Floyd and Mr. Dixon, right?   No

 3    doubt about that.   I believe he scammed the government.   Sure

 4    glad he didn't scam me and, as I said before, I hope he doesn't

 5    scam you.

 6            And if you follow the law in this case as is given to

 7    you by Judge Evans with respect to entrapment -- I got to say

 8    one more thing and then I'm done.   There's this thing about

 9    predisposition.   Of course, once it's established and you

10    believe that he has been induced and persuaded by the

11    government, as is in this case, the government introduced

12    evidence to show that he's predisposed, just as Mr. Scarborough

13    said, that he was predisposed to commit this crime, not some

14    other time but this.   They have introduced some incidents

15    involving two things.   One in 2009, which, of course, Mr. Slack

16    testified, as you remember, that there was no way that

17    Mr. Floyd could have been there at this alleged place at that

18    alleged time.   And then this other thing in North Carolina.

19            The Court will tell you that they can introduce

20    evidence of predisposition but that evidence is not

21    dispositive, which means that shouldn't decide the case.

22    Ultimately what should decide the case is what you believe

23    happened on this case, what led to this incident that occurred

24    June 21st, 2012.

25            And I think if you do that none of us will be caught

1    up in the scam of Mr. Guyton and your verdict will be clear:

2    not guilty as to all things, because if you agree that there's

3    entrapment then you find him not guilty of everything because

4    none of this would have occurred, wouldn't have a shotgun, the

5    drug issue wouldn't be there, none of it would be there.

6            Thank you, ladies and gentlemen.

7            THE COURT:  We are going to just take a five-minute

8    stretch break and then we'll hear the government's final

9    argument.

10           (Recess, 12:08 p.m. to 12:15 p.m.)

11           THE COURT:  Bring the jury in, please.

12           (Jury returned to the courtroom.)

13           THE COURT:  Please be seated.  Ladies and gentlemen,

14   now we will hear the government's final argument.  Ms. Webb.

15           MS. WEBB:  Corroboration.  Did the things you heard

16   from the witnesses on the stand corroborate, do they line up?

17   Do the things that Mr. Guyton tell you line up with the things

18   the law enforcement agents told you and the things Mr. Slack

19   told you?  And do they line up with the evidence you've seen?

20           What did Mr. Guyton tell you?  He told you that

21   Mr. Dixon made a believer out of him, that Mr. Dixon could do

22   these robberies and not get caught.  When he told him that he

23   had robbed his friend, Glen Cook, is that corroborated?

24   Mr. Dixon's own words on tape:  This is our livelihood.  I done

25   robbed Cook.

1          He doesn't just say it -- and you'll have the tapes

2     and the transcripts with you -- he goes into it.  Why he did

3     it, all this.  He has a whole explanation for why he robbed

4     Cook.

5          And Mr. Slack testified about a robbery he went on

6     with Mr. Dixon of a good friend of Mr. Dixon's, someone who

7     Mr. Dixon knew the schedule of, knew he was watching a game,

8     knew he would be drunk, he was sloppy, a drug dealer who was

9     sloppy.  And they laid in wait and they beat the man until he

10    agreed to take them inside.  When the burglar alarm went off

11    they fled, they got away.

12         Mr. Dixon told Mr. Guyton, you've heard this several

13    times:  "My shit is calculated."  Those are his words.  His

14    words.

15         When you think about who came up with these plans,

16    listen to the tapes, listen to the voices.  Who's schooling

17    whom about how to do this?  How to do a stash house robbery,

18    what gear to get, what you need to do to get the junk from the

19    people you're robbing, what equipment to bring, how many

20    people.  Who's saying three scenarios for how to do this?  It's

21    not Mr. Guyton.  It's not United States law enforcement

22    officers.  It's Mr. Dixon.

23         You heard a lot about predisposition and

24    predisposition has to be about the type of crime, the kind of

25    crime.  Here that's conspiracy to commit robbery.  And you've

1  heard evidence that is corroborated about Mr. Dixon's previous

2  robberies.  He robbed Glen Cook.  That's corroborated, as we

3  just went over.  Talked about the Lexus and you heard several

4  times Mr. Dixon drove a Lexus and when Mr. Slack was asked what

5  kind of car did he drive you over to that house in, what did he

6  say?  A Lexus.  Corroboration.

7       You heard testimony from Mr. Slack that Mr. Dixon

8  robbed a house where some Hispanic people were and that he beat

9  one of those or someone in his group beat one of those people,

10 that they got what out of it?  Cocaine.  Robbed them for

11 cocaine.  And that's corroborated by Mr. Dixon's statements on

12 tape that he's used to hitting people who are Spanish speaking

13 and that he has Spanish-speaking crew members he can take with

14 him when necessary to translate, to make the demands.

15      Is it corroborated by anything else, the idea that

16 Mr. Dixon already was predisposed to do this?  Well, how about

17 the fact that it's not Mr. Guyton that suggests that there will

18 be drugs in the house, it's Mr. Dixon.  Mr. Guyton is talking

19 about money, 200 and change is there right now and Mr. Dixon

20 says and dope possibly.  That's from the April recording.

21      It's corroborated by the meeting Mr. Dixon had with

22 the undercover agent, Shawn and Shawn says:   I ain't never

23 done this before.  I ain't going to lie.

24      Mr. Dixon says:  I have, several times.

25      You heard Agent Stallo talk about how he provides an

1   out.  He says, in his undercover role, if you don't want to do
2   this don't do this.
3          What did Mr. Dixon respond?  No, no, it's all good.
4          You just heard some talk about how Mr. Guyton kept
5   saying on the day of to the other people that were there,
6   including Mr. Floyd, If you don't want to do this we could
7   wait, we can do it another time.
8          And one interpretation of that that was suggested
9   was, well, maybe he saw reluctance.  Another inference you
10  could draw from that is maybe he was providing a possible out
11  and no one took him up on it.  You heard what Mr. Slack said,
12  the hesitation that was expressed was Mr. Slack, he didn't feel
13  comfortable, robbing a drug house?  No.  He didn't feel
14  comfortable doing it in the daytime.  That was the only
15  hesitation.
16         Mr. Dixon is a planner.  Three scenarios.  Mr. Guyton
17  give three scenarios?  No.  Did law enforcement give three
18  scenarios?  No.  Mr. Dixon, who relied on his previous
19  experiences, and he gave three scenarios.  This is on tape.
20  These are his words.
21         Is he predisposed?  He had a crew:  I got a team.  I
22  got a team.  The people I run with, I been running with.
23         It's not a new experience.  And listen to him on the
24  tapes.  Does he sound like he doesn't know what he's doing?
25  Does he sound inexperienced?  Does he have a lot of questions

1    about how does one do a robbery, or does he provide the

2    directions and the equipment?

3            This is our livelihood.  That's how he put it on

4    tape:  This is our livelihood.

5            Now, it's true Mr. Dixon wasn't there on the day of.

6    He left town.  He had a contract, he had to take photographs.

7    But he stayed in touch.  He left town.  He left his friends to

8    pull off the robbery.  He left them holding the literal bag if

9    something went wrong, and you'll have to back there with you.

10   And you already heard the bag, on the inside of this bag that

11   was there at the scene has a dry cleaning tag on it with

12   Mr. Dixon's name on it and the witnesses testified the guns and

13   equipment were inside a bag.

14           He provided assistance during the day, talked on the

15   phone to Mr. Floyd, told him how to load the shotgun, a gun

16   that Mr. Slack said that he recognized, a gun that's got some

17   distinctive markings.  It's missing a piece here.  It's not

18   just shortened, it's cut off at an angle.  This is the gun

19   Mr. Slack testified was used to beat Mr. Dixon's friend, the

20   sloppy drug dealer, and it was there on June 21st and it came

21   out of a bag.

22           And after the robbery had -- after Mr. Dixon was told

23   by Mr. Guyton -- and you heard that call -- that the robbery

24   had happened but the other guys had driven off with all the

25   cocaine and Mr. Guyton didn't have any, he was worried he

1    wasn't going to get his cut, what does Mr. Dixon do?  And
2    you'll have this with you, you can look at it.  Agent Burnett
3    testified, this is that call you heard, calls his friends over
4    and over and over again.

5           Mr. Floyd -- also his attorney talked to you about
6    predisposition.  Mr. Floyd's attorney wants you to believe some
7    of what Mr. Slack said, like that Mr. Slack didn't remember how
8    the guns got there, and he wants to disbelieve other things
9    Mr. Slack says, he wants you to cherry pick, believe the part
10   that's good for Mr. Floyd, don't believe the part that's bad
11   for Mr. Floyd.

12          Mr. Slack told you about an incident in North
13   Carolina.  What does that have in common with these other
14   incidents?  It's a robbery of a drug dealer.  Mr. Floyd,
15   according to Mr. Slack, carried a gun, like he carried a gun
16   this time.  In that incident things went wrong.  The guy
17   struggled, he was rah-rah, he was rowdy, and things went
18   terribly wrong.

19          And Mr. Floyd didn't just tell Mr. Slack about this
20   one time, he brought it up over the years.  Talked about
21   getting a tattoo, though his friends talked him out of that,
22   don't put your business out there.  He would bring it up and he
23   brought up on the day of the robbery on tape and we listened to
24   that, you listened to that in the courtroom, what is this job
25   going to be like, are these guys rah-rah?  Are they going to

1    start to reach?

2         And he talked about a previous situation where
3    someone got killed.  And you can listen to that again, it's on
4    a file with the date 20-12-06-21_093914_CI and it starts at 32
5    minutes and 22 seconds and goes on for eight minutes, that clip
6    you heard.  That's where he says that, you can listen to it
7    again.

8         And did Mr. Floyd seem like someone who wasn't
9    predisposed to do this?  He was handing out the gear.  He put
10   on the police clothes.  He scared off Mr. Wilson and he coaxed
11   him back.  He coaxed him back.  He was carrying the biggest gun
12   and he didn't know how to load it at first but he got it
13   loaded.  Saw the picture, there's a round.  Agent Norman told
14   you about that.  And he handed, you heard the testimony, he
15   handed Mr. Wilson that .44 Magnum, that one, and it was loaded.
16   You heard the testimony.

17        The defense asks you to look at the frame and ignore
18   the picture.  Look at both.  How did Mr. Dixon come to the
19   government's attention?  Yes.  How did someone whose shit is so
20   calculated who always uses an inside man so he doesn't get
21   caught, how did he end up why you the government's attention?

22        Well, he proposed a robbery to a man who was working
23   as an informant and the government started investigating him
24   and the things he said on tape backed up the fact that he had
25   said he wanted to do this robbery.  Backed up the idea he was a

1    planner, someone who was careful, someone who knew how to do

2    this.

3             And he brought in Mr. Floyd.  Who brought Mr. Floyd

4    to the first meeting with the undercover agents?  It wasn't

5    Mr. Guyton.  It was Mr. Dixon.

6             Who gave Mr. Floyd the guns?  It wasn't Mr. Guyton

7    and it wasn't the government.

8             So why should you care?  Why should you care?  Tony

9    didn't exist.  I mean Agent Harvey, you saw him, but Tony

10   didn't exist.  And so hearing about this, he's planning to rob

11   Tony.  Well, Tony doesn't exist so why not just let it go?

12            You heard from Agent Stallo why these cases happen.

13   Even had Tony existed, let's say he was a drug dealer, why

14   should you care?  Why should you care?  People robbing drug

15   dealers, so what.

16            You heard from Agent Stallo what can happen.  The

17   wrong house gets hit, the wrong people are inside.  These

18   houses move frequently.  You've heard testimony from a couple

19   of people, these houses move frequently.  And so a group of men

20   are going to run into a house with loaded weapons.  That's why

21   you should care.

22            Ladies and gentlemen, focus on statements on tape,

23   think about how the people sound, think about what questions

24   they're asking.  How much drugs are going to be there?  That

25   was Mr. Floyd's question, how, how many?  What kind of guards?

1    What are they going to be like?  Are these people that were

2    predisposed?

3              Well, Mr. Dixon told you what they were like:

4    They're not standby, they're ride or die.

5              And Agent Stallo, you heard some about the reactive

6    versus the proactive, Agent Stallo testified that reactive is

7    hard because the victims often don't -- they won't cooperate.

8              Is that corroborated by anything?  Mr. Dixon had a

9    plan to make the victims not cooperate.  What was he going to

10   do?  He was going to brand something on their foreheads and

11   then it will be up to them to go on and tell the police.  They

12   won't because they'll be embarrassed because their skin will

13   have been burned.

14             You have the evidence.  Look at it, look where it

15   lines up.  These men were not entrapped.  That's what the

16   evidence shows.

17             Thank you for your attention, ladies and gentlemen.

18             THE COURT:  Members of the jury, we are going to take

19   a lunch break until 1:20.  When you all come back from lunch

20   I'll give you the instructions on the law and then you'll be

21   able to start your deliberations.  However, at this point don't

22   start thinking about how you're going to decide the case.  Do

23   not discuss the case among yourselves or with anyone else,

24   either during the lunch break or in the jury room at this

25   point.  I'll see you all at 1:20.  Court is in recess until

1    1:20.

2               (Luncheon recess, 12:40 p.m. to 1:23 p.m.; following

3    proceedings outside the presence of the jury.)

4          THE COURT:  Counsel, let me address something with

5    you.  I had what I thought was the final copy of your special

6    verdict form.  Ms. Hanna says that just before we broke for

7    lunch -- you correct me if this is wrong -- she got

8    instructions to add Mr. Dixon to the Count Four special verdict

9    form.  I don't believe Mr. Dixon is charged in Count Four.

10         MS. WEBB:  Well, as to that he aided and abetted

11   Mr. Floyd and being a felon in possession of a firearm, the one

12   that we had some Rule 29 argument about yesterday.

13         THE COURT:  I just don't read your -- let me get my

14   copy of the indictment here.  The way this indictment is drawn

15   up, and I know that doesn't -- you all didn't draw it up, but

16   the way it is drawn up is very confusing.  I mean, for one

17   thing, the names of all of the people who -- well, there are

18   names of various people mentioned in Count Four but obviously

19   they're not -- for example, Mr. Slack is mentioned.  He's not a

20   defendant in this case.  And normally, in my experience, it's

21   only the defendant who's charged is capitalized and I think

22   it's confusing.  The prior version of the verdict form that I

23   had looked at before we took our lunch break only mentioned

24   Mr. Floyd in Count Four.

25         MR. SCARBOROUGH:  Yes, Your Honor.  I sort of relied

1    on that.  I can see how the count might be read the way the

2    government suggests but I had seen the proposed verdict form

3    without that and I didn't address it in closing.  So I would

4    ask that it not be modified as stated.  I had expressed no

5    objection to the proposed verdict form but that was before this

6    change was made.

7         MS. WEBB:  And, Your Honor, the change was made after

8    the Court denied the Rule 29 motion and the argument that we

9    had yesterday about whether or not Mr. Dixon could be charged

10   with aiding and abetting Mr. Floyd with Count Four.

11        So we understood that the Court was denying the Rule

12   29 motion as to Mr. Dixon's aiding and abetting of Mr. Floyd in

13   Count Four and so it would be appropriate to let the jury

14   decide whether or not Mr. Dixon committed the crime of aiding

15   and abetting Mr. Floyd in that count.  That's the reason it's

16   added to the verdict form.

17        THE COURT:  Well, the way I remember the argument on

18   the Rule 29, it was basically we move for dismissal of

19   everything and I denied that.

20        MR. SCARBOROUGH:  I think I did hop up and say

21   something about that count and later I was reflecting about it

22   and wondered why I had done so because the verdict forms that I

23   had seen didn't suggest that the jury would be considering that

24   count as to my client.

25        MS. WEBB:  I think actually the Court raised the

1    issue of that count after there was -- the general Rule 29

2    motion made, the Court specifically asked questions about the

3    aiding and abetting charge as to Mr. Dixon in Count Four and

4    the way I understood it was after argument this morning, that

5    after argument the Court denied the Rule 29 motion as to all

6    the counts, including the specific --

7         THE COURT:  I did, I denied the Rule 29 motion across

8    the board.

9         MR. SCARBOROUGH:  I would have at least mentioned

10   that in closing if I thought that was an issue as to Mr. Dixon.

11        MS. WEBB:  The only -- I think the government said

12   during its initial closing argument, you know, mentioned

13   Mr. Dixon's aiding and abetting Mr. Floyd as to both of those

14   counts.

15        THE COURT:  See, I thought, I did understand you had

16   an aiding and abetting in here but to say that one person aids

17   and abets another does not make the aider and abettor a

18   defendant.  Do you see what I'm saying?

19        MS. WEBB:  Well, if the person is not the defendant

20   in the indictment then that's true.  However, Mr. Dixon is a

21   defendant to this indictment and so, for instance, the

22   distinction here is between Mr. Dixon, who is a defendant in

23   the indictment, and it says aided and abetted by defendants,

24   and then lists the three, and it says and Slack, who is not

25   charged in the superseding indictment.  So there's a

1    distinction drawn in the wording of the indictment there.

2              THE COURT:  I see what you're saying but I don't

3    think it's very clear.

4              MS. WEBB:  It says aided and abetted by defendants,

5    it has the two defendants who are named, Dixon and Wilson, and

6    then it says and by Slack, who is not charged.

7              THE COURT:  Well, I guess the best thing to do at

8    this point is to use your -- the verdict form that you want

9    from Count Four, that is the form that would, the version that

10   would say that Mr. Dixon is charged in Count Four and if he's

11   convicted we'll see what happens later.

12             MR. SCARBOROUGH:  The Court will note my objection to

13   that?

14             THE COURT:  I do.

15             MR. SCARBOROUGH:  Thank you.

16             THE COURT:  This indictment has a lot of problems, in

17   my opinion.  I'm not talking about evidence, now, I'm just

18   talking the way it's put together.

19             MS. WEBB:  I understand, Your Honor.

20             THE COURT:  Bring the jury in, please.

21             (Jury returned to the courtroom, 1:32 p.m.)

22             THE COURT:  Please be seated.

23             Members of the jury, it now becomes my job to

24   instruct you on the rules of law which you must apply in

25   reaching your decision in this case.

1           In any jury trial there are two judges.  I'm one and

2    you are the other.  It's your duty to determine the facts and

3    in doing so you must consider only the evidence admitted.

4           Your job at the end of the trial, after I've finished

5    giving you my instructions, will be to decide whether the

6    government has proved beyond a reasonable doubt the specific

7    facts necessary to find the defendants guilty of the crimes

8    charged.

9           You'll make your decision based only on the testimony

10   and evidence presented during the trial.  You must not be

11   influenced in any way by sympathy or prejudice for or against

12   the defendants or the government.  And you must follow the law

13   as I state it regardless of whether you agree with it.  You may

14   not single out or disregard any of my instructions on the law.

15          Now, in determining the facts you must consider only

16   the evidence admitted.  The term "evidence" includes the sworn

17   testimony of the witnesses, any exhibits admitted into the

18   record, and any stipulations of fact agreed upon by the

19   parties.

20          You shouldn't assume from anything I may have said

21   during the trial that I have any opinion about any factual

22   issue in this case.  Deciding the facts is your job.

23          Remember that any statements, objections, or

24   arguments made by the lawyers are not evidence.  The lawyers'

25   job is to point out those things which are most significant to

1   their side of the case and, in doing that, to call your

2   attention to certain facts or inferences that might otherwise

3   escape your attention.

4          Where an objection to a question was sustained, you

5   should not speculate as to what the answer might have been or

6   consider any response to the question by the witness.  Neither

7   should you consider any matter stricken from the record.

8          You're instructed that a question is not evidence.

9   You may not assume to be true any insinuation merely suggested

10  by a question.  The testimony of the witness, not the question,

11  supplies the evidence.

12         In the final analysis it's your own recollection and

13  interpretation of the evidence which controls.

14         While you may consider only the evidence, you are

15  allowed to draw such reasonable inferences from the evidence as

16  you feel are justified in the light of common experience.  In

17  other words, you may make deductions and reach conclusions

18  which reason and common sense lead you to draw from the facts

19  which have been established by the evidence.

20         You may consider either direct or circumstantial

21  evidence.  Direct evidence is the testimony of one who asserts

22  actual knowledge of a fact, such as an eyewitness.

23  Circumstantial evidence is proof of a chain of facts and

24  circumstances indicating either that a particular defendant is

25  guilty or not guilty.

1          The law requires only that you weigh all of the

2     evidence and determine that the government has proved all

3     elements of the crimes charged beyond a reasonable doubt before

4     the defendants can be convicted.

5          Now, in saying you must consider the evidence, I

6     didn't mean you must accept all of it as true or accurate.  You

7     must decide whether you believe what each witness had to say

8     and how important the testimony was.  In making that decision,

9     you may believe or disbelieve any witness in whole or in part.

10    The number of witnesses testifying concerning any particular

11    fact is not controlling.

12         In deciding whether you believe or don't believe any

13    witness I suggest you ask yourself a few questions.  Did the

14    witness impress you as one who was telling the truth?  Did the

15    witness have any particular reason not to tell the truth?  Did

16    the witness have a personal interest in the outcome of the

17    case?  Did he or she seem to have a good memory?  Did the

18    witness have the opportunity and ability to observe accurately

19    the things he or she testified about?  Did the witness appear

20    to understand the questions clearly and answer them directly?

21    Did the witness's testimony differ from other testimony and

22    evidence?

23         You should keep in mind, of course, that a simple

24    mistake by a witness doesn't necessarily mean that he or she

25    was not telling the truth as he or she remembers it because

1    people naturally tend to forget some things or remember other

2    things inaccurately.  If a witness made a misstatement you

3    should consider whether it was merely an innocent lapse of

4    memory or rather an intentional falsehood.  That may depend on

5    whether it has to do with an important fact or only with an

6    unimportant detail.

7          Evidence of a defendant's character traits may create

8    a reasonable doubt.  You should consider testimony that a

9    defendant is an honest and law-abiding citizen along with all

10   the other evidence to decide whether the government has proved

11   beyond a reasonable doubt that the defendant committed the

12   offense in question.

13         You must consider some witnesses' testimony with more

14   caution than others.  For example, witnesses who hope to gain

15   more favorable treatment in their own case may have a reason to

16   make a false statement in order to strike a good bargain with

17   the government.

18         While a witness of that kind may be entirely truthful

19   when testifying, you should consider that testimony with more

20   caution than the testimony of other witnesses.

21         Furthermore, in this case the government has made a

22   plea agreement with certain co-defendants in exchange for their

23   testimony.  Such plea bargaining, as it's called, provides for

24   the possibility of a lesser sentence than the co-defendant

25   would normally face.

1          Plea bargaining is lawful and proper and the rules of

2    this court expressly provide for it.  But a witness who hopes

3    to gain more favorable treatment may have a reason to make a

4    false statement in order to strike a good bargain with the

5    government.  While a witness of that kind may be entirely

6    truthful when testifying, you should consider that testimony

7    with more caution than the testimony of other witnesses.

8          The fact that a particular witness pled guilty to the

9    offenses charged is not evidence of the guilt of any other

10   person.

11         During the trial you heard evidence of bad acts done

12   by the defendants on trial on occasions that may be similar to

13   acts the defendants are currently charged with.  You must not

14   consider any of this evidence to decide whether the defendants

15   committed the acts charged now, but you may consider this

16   evidence for other very limited purposes.

17         If other evidence leads you to decide beyond a

18   reasonable doubt that the defendants committed the charged

19   acts, you may consider evidence of similar acts done on other

20   occasions to decide whether the defendants had the state of

21   mind or intent necessary for the crimes charged, acted

22   according to a plan or to prepare to commit a crime, or

23   committed the charged acts by accident or mistake.

24         In addition, as you know, the defendants have raised

25   the defense of entrapment in this case.  In determining whether

1    the defendants were predisposed to commit the crimes charged

2    you may also consider evidence of any prior similar bad acts.

3            Evidence of prior similar bad acts is not necessarily

4    dispositive of the question of predisposition but you may

5    consider it along with all the other evidence in the case in

6    determining whether a defendant was already willing to commit

7    the crimes charged.

8            In the final analysis the jury may give the testimony

9    of any witness such credibility or weight, if any, as the jury,

10   in its sole discretion, may find appropriate.

11           When knowledge of a technical subject matter might be

12   helpful to the jury, a person having special training or

13   experience, one called an expert witness, is allowed to state

14   his or her opinion concerning those matters.  Merely because an

15   expert witness has expressed an opinion, however, does not mean

16   that you must accept it.  The same as with any other witness,

17   it's up to you to decide whether to rely on that witness's

18   testimony.

19           Now, this case began when a grand jury returned an

20   indictment against the defendants.  The indictment contains the

21   formal charges against them.  Now, you will have a copy of the

22   indictment in the jury room and so I'm not going to read it to

23   you at this time but I'll describe it and I'll give you legal

24   instructions concerning the elements of the crimes that are

25   charged.

1        You're instructed that the indictment is not itself
2   evidence.  It's a piece of paper that outlines the charges.
3        You're instructed that the defendants have come into
4   court and have pled not guilty.  The effect of their pleading
5   not guilty is to place the burden on the government of proving
6   each element of the offenses charged beyond a reasonable doubt.
7   If the government fails to do that, you must find the
8   defendants not guilty.
9        The effect of their pleading not guilty is to place
10  the burden on the government of proving each element of the
11  offenses charged beyond a reasonable doubt.  If the government
12  fails to do that you must find the defendants not guilty.  The
13  defendants are presumed by law to be innocent unless and until
14  proven guilty.  The law does not require a defendant to prove
15  his innocence or in fact to produce any evidence at all.
16       The government has the burden of proving the
17  defendants guilty beyond a reasonable doubt.  If it fails to do
18  that you must find the defendant in question not guilty.
19       A defendant has no obligation to testify in a
20  criminal case.  You may not draw inferences unfavorable to the
21  defendants from their respective decisions not to testify.
22       Now, while the government's burden of proof is a
23  strict or heavy burden, it is not necessary that a defendant's
24  guilt be proven beyond all possible doubt.  It's only required
25  that the government's proof exclude any reasonable doubt

1    concerning a defendant's guilt.

2              A reasonable doubt is a real doubt based on reason

3    and common sense after careful and impartial consideration of

4    all the evidence in the case.

5              Proof beyond a reasonable doubt, therefore, is proof

6    of such a convincing character that you would be willing to

7    rely and act upon it without hesitation in the most important

8    of your own affairs.

9              If you are convinced that a defendant has been proven

10   guilty beyond a reasonable doubt, say so.  If you are not

11   convinced, say so.

12             Now, when you look at the indictment you will see

13   that there are different charges in it and they are divided

14   into what we call counts.  Each count has a number and the

15   first charge is labeled Count One and so forth.

16             You'll see that the indictment charges that crimes

17   were committed on or about certain dates.  The government

18   doesn't have to prove that the crime occurred on an exact date.

19   It's enough if it proves beyond a reasonable doubt that the

20   crime was committed on the date reasonably close to the date

21   alleged.

22             The word "knowingly" means that an act is done

23   voluntarily and intentionally and not because of mistake or

24   accident.

25             The word "willfully" means an act is committed

1    voluntarily and purposely with the intent to do something the
2    law forbids.  That is, with bad purpose to disobey or disregard
3    the law.
4           While a person must have acted with the intent to do
5    something the law forbids before you can find the person acted
6    willfully, the person need not be aware of the specific law or
7    rule that his conduct may be violating.
8           Turning first to Count One of the indictment, both
9    defendants are charged in Count One with conspiring to rob a
10   person who they believed to be engaged in narcotics
11   trafficking.  Title 18 U.S. Code, Section 1951 makes it a
12   federal crime for anyone to conspire or agree with someone else
13   to obtain or take property of another by robbery and, in doing
14   so, to obstruct, delay, or affect commerce, or the movement of
15   articles of commerce.
16          A conspiracy is an agreement by two or more people to
17   commit an unlawful act.  It's a kind of partnership for
18   criminal purposes.  Every member of the conspiracy becomes the
19   agent or partner of every other member.
20          The government does not have to prove that all the
21   people named in the indictment were members of the plan or that
22   those who were members made any kind of formal agreement.  The
23   government does not have to prove that the members planned
24   together all of the details of the plan.  The heart of the
25   conspiracy is the making of the unlawful plan itself, so the

1    government does not have to prove that the conspirators

2    succeeded in carrying out the plan.

3         A defendant can be found guilty of the offense

4    charged in Count One only if all of the following facts are

5    proven beyond a reasonable doubt:  That two or more people in

6    some way agreed to commit a robbery as described; secondly,

7    that the defendant knew the goal of the conspiracy, that is,

8    the robbery; and, third, that the defendant willfully

9    participated in helping to accomplish the goal.

10        You're instructed that factual impossibility is not a

11   defense to a conspiracy under this statute.  The essence of the

12   conspiracy charge is the agreement itself.  Therefore, the fact

13   that it may have been factually impossible for the conspirators

14   to achieve their goal is not a defense to the conspiracy charge

15   alleged in Count One.

16        A person may be a conspirator without knowing all the

17   details of the unlawful plan or the names and identities of all

18   the other alleged conspirators.  If the defendant played only a

19   minor part in the plan but had a general understanding of the

20   unlawful purpose of the plan and willfully joined in the plan

21   on at least one occasion, that's enough for you to find the

22   defendant guilty.  But simply being present at the scene of an

23   event or merely associating with people and discussing common

24   goals and interests does not establish proof of a conspiracy.

25        A person who doesn't know about a conspiracy but

1    happens to act in a way that advances some purpose of a

2    conspiracy does not automatically become a conspirator.

3            The first element you must find is that two or more

4    persons in some way agreed to commit a robbery encompassed

5    within the statute.  The statute has been called the Hobbs Act.

6            If two or more people in some way agree to commit a

7    robbery encompassed within the Hobbs Act that means the persons

8    agreed to, one, first to acquire someone else's personal

9    property; second, to take the property against the victim's

10   will but using -- and using actual or threatened force or

11   violence or causing the victim to fear harm, either immediately

12   or in the future; third, that the object of the conspiracy,

13   that is, the robbery, had the potential to obstruct, delay, or

14   affect interstate commerce.

15           Interstate commerce is the flow of businesses between

16   one state and anywhere outside that state.  It is enough for

17   the government to show that had the conspiratorial objective

18   been accomplished, interstate commerce would have been

19   affected.  That is, the government does not need to prove an

20   actual effect on interstate commerce.  Instead, the government

21   need only prove that the objective of the conspiracy, if

22   carried out, had the potential to affect interstate commerce.

23   Moreover, it is enough if you decide that there would be any

24   effect on interstate commerce.  The effect can be minimal.

25           "Property" includes money, tangible things of value,

1    and intangible rights that are a source or element of income or
2    wealth.
3              "Fear" as used in the statute means a state of
4    anxious concern, alarm, or anticipation of harm.  It includes
5    the fear of financial loss, as well as fear of physical
6    violence.  All right, so that's count one.
7              Now going on to Count Two.  Both of the defendants
8    are charged in Count Two with carrying a firearm during or in
9    furtherance of a crime of violence, or of aiding and abetting
10   someone in carrying a firearm during or in furtherance of a
11   crime of violence.
12             It's a separate federal crime for anyone to carry a
13   firearm during and in relation to a crime of violence.
14             Both defendants are charged in this count.  They're
15   both charged in Count Two.
16             A defendant can be found guilty of this crime only if
17   all the following facts are proven beyond a reasonable doubt:
18   First, that the defendant in question committed the crime of
19   violence as charged in Count One; secondly, that the defendant
20   or someone he conspired with or aided and abetted knowingly
21   carried a firearm; third, that the defendant or someone he
22   conspired with or aided and abetted carried the firearm in
23   relation to the violent crime.
24             A firearm is any weapon designed or readily
25   convertible to expel a projectile by the action of an

1    explosive.  The term includes the frame or receiver of any such

2    weapon or any firearm muffler or silencer.

3          To carry a firearm is to have a firearm on one's

4    person, or to transport or control a firearm in a way that

5    makes it available for immediate use while committing the

6    violent crime.

7          To carry a firearm in relation to a crime means there

8    must be a firm connection between the defendant, the firearm,

9    and the violent crime.  The firearm must have helped with some

10   important function or purpose of the crime and not simply have

11   been there accidentally or coincidentally.

12         You must also decide for each of the defendants

13   whether he or someone he aided and abetted carried a Mossberg

14   shotgun with a barrel of less than 18 inches.

15         It's possible to prove a defendant guilty of a crime

16   even without evidence that he personally performed every act

17   involved.  Ordinarily, any person -- any act a person can do

18   may or be done by directing another person, or agent.  Or it

19   may be done by acting with or under the direction of others.

20         A defendant aids and abets a person if the defendant

21   intentionally joins with the person to commit a crime.

22         A defendant is criminally responsible for the acts of

23   another person if the defendant aids and abets the other

24   person.  A defendant is also responsible if the defendant

25   willfully directs or authorizes the acts of an agent, employee,

1    or other associate.

2              But finding that a defendant is criminally

3    responsible for the acts of others requires proof that the

4    defendant intentionally associated with or participated in the

5    crime, not just proof that the defendant was simply present at

6    the scene of a crime or knew about it.  In other words, you

7    must find beyond a reasonable doubt that the defendant was a

8    willful participant and not merely a knowing spectator.

9              In Count Three of the indictment both defendants are

10   charged with conspiring to possess with intent to distribute

11   over five kilograms of cocaine.

12             It's a separate federal crime for anyone to conspire

13   to possess with intent to distribute cocaine.

14             A conspiracy is an agreement between two or more

15   persons to commit an unlawful act.  In other words, it's a kind

16   of partnership in criminal purposes.  Every member of the

17   conspiracy becomes an agent or partner of every other member.

18             The government does not have to prove that all the

19   people named in the indictment were members of the plan or that

20   those who were members made any kind of formal agreement.  The

21   heart of a conspiracy is the making of the unlawful plan

22   itself, so the government doesn't have to prove that the

23   conspirators succeeded in carrying out their plan.

24             A defendant can be found guilty only if all the

25   following facts are proven beyond a reasonable doubt:  First,

1    that two or more people agreed to try to accomplish a shared

2    and unlawful plan to possess cocaine; secondly, the defendant

3    knew the unlawful purpose of the plan and willfully joined in

4    it; third, that the object of the plan was to possess with

5    intent to distribute more than five kilograms of a mixture or

6    substance containing cocaine.

7         The fact that it was not possible for the

8    conspirators to accomplish the object of the conspiracy is not

9    a defense to a conspiracy charge.

10        A person may be a conspirator even without knowing

11   all of the details of the unlawful plan or the names and

12   identities of all the other alleged conspirators.

13        If the defendant played only a minor part in the plan

14   but had a general understanding of the unlawful purpose of the

15   plan, and willfully joined in the plan on at least one

16   occasion, that is enough for you to find that defendant guilty.

17        But simply being at the scene of an event or merely

18   associating with certain people and discussing common goals and

19   interests does not establish proof of a conspiracy.  Also, a

20   person who doesn't know about a conspiracy but happens to act

21   in a way that advances some purpose of one, doesn't

22   automatically become a conspirator.

23        Turning now to Count Four.  Defendants Floyd and

24   Dixon are charged in Count Four of the indictment with

25   possessing a firearm after being convicted of a felony offense.

1      It's a federal crime for anyone who's been convicted

2  of a felony offense to possess a firearm in or affecting

3  interstate or foreign commerce.

4      A defendant can be found guilty of this crime only if

5  all of the following facts are proven beyond a reasonable

6  doubt:  First, the defendant knowingly possessed a firearm in

7  or affecting interstate or foreign commerce; second, before

8  possessing the firearm the defendant had been convicted of a

9  felony, a crime punishable by imprisonment for more than one

10  year.

11      The term "interstate or foreign commerce" includes

12  the movement of a firearm from one state to another or between

13  the United States and any foreign country.  It's not necessary

14  for the government to prove that the defendant knew the firearm

15  had moved from one state to another, only that the firearm did,

16  in fact, move from one state to another.

17      The law recognizes several kinds of possession.  A

18  person may have actual or constructive possession.  He may have

19  sole possession or joint possession.

20      "Actual possession" occurs if a person knowingly has

21  direct physical control over it.

22      "Constructive possession" of a thing occurs if a

23  person doesn't have actual possession but has both the power

24  and the intention to take control over it later.

25      "Sole possession" occurs if a person is the only one

1   to possess it.

2           "Joint possession" occurs if two or more people share

3   possession.

4           The term "possession" includes actual, constructive,

5   sole, and joint possession.

6           Now, both defendants have claimed the defense of

7   entrapment as to all the counts in the indictment.  You're

8   instructed that entrapment occurs when law enforcement officers

9   or others under their direction persuade a defendant to commit

10  a crime that the defendant had no previous intent to commit.

11          The law forbids convicting an entrapped defendant.

12  But there is no entrapment when a defendant is willing to break

13  the law and the government merely provides what appears to be a

14  favorable opportunity for the defendant to commit a crime.

15          For example, it's not entrapment for a government

16  agent to pretend to be someone else and offer, directly or

17  through another person, to engage in an unlawful transaction.

18          So a defendant isn't a victim of entrapment if you

19  find beyond a reasonable doubt that the government only offered

20  the defendant an opportunity to commit the crime the defendant

21  was already willing to commit.

22          But if there is a reasonable doubt about whether the

23  defendant was willing to commit the crime without the

24  persuasion of a government officer or a person under the

25  government's direction, then you must find the defendant not

1    guilty.

2         A separate crime is charged in each count of the

3    indictment.  Each charge and the evidence pertaining to it

4    should be considered separately.  The fact that you might find

5    one defendant guilty or not guilty as to any of the offenses

6    charged should not control your verdict as to any other offense

7    charged or as to the other defendant on trial.

8         You're here to determine from the evidence whether

9    each defendant is guilty or not guilty.  Each defendant is on

10   trial only for the specific offenses charged in the indictment.

11        The question of punishment should never be considered

12   by the jury in any way in deciding the case.  If a defendant is

13   convicted, the matter of punishment is for the Court alone to

14   decide.

15        Any verdict you reach, whether guilty or not guilty,

16   must be unanimous.  To return a verdict, you must all agree.

17   Your deliberations will be secret.  You'll never have to

18   explain your verdict to anyone.

19        It's your duty as jurors to reach -- to discuss the

20   case with one another in an effort to reach agreement if you

21   can do so.  Each of you must decide the case for yourself but

22   only after full consideration of the evidence with the other

23   members of the jury.

24        While you're discussing the case don't hesitate to

25   reexamine your own opinions and change your minds if you become

1  convinced you were wrong, but don't give up your honest beliefs

2  solely because others think differently or merely to get the

3  case over with.

4          Remember, you're judges of the facts.  Your only

5  interest is to seek the truth from the evidence.

6          Now, when you go into the jury room you should first

7  select one of your members to be your foreman or forewoman.

8  That person will preside over your deliberations.

9          If you have a question you want to ask me while you

10  are deliberating, for example, if you want more instructions or

11  a reinstruction on a point of law, please write your question

12  down on a piece of paper, have it signed by either your

13  foreperson or by any member of the jury, and give it to the

14  court security officer who will be right outside your jury

15  room.  He'll bring your question to us and we'll get you an

16  answer as soon as we can.

17          I do caution you that if you send us a note, please

18  don't indicate in it how you are leaning or how are you are

19  divided on any issue, if either is the case at that particular

20  time.

21          When you look at the verdict form I think you will

22  find that it is self-explanatory.  It is what we call a special

23  verdict form.  It's not one of those verdict forms where you

24  just write in either "guilty" or "not guilty" on each of the

25  charges.  It asks specific questions and you will see that

1    there is sort of a roadmap built into these questions.  Like,

2    you know, it will say if you find a certain defendant not

3    guilty on a certain count then you skip over something else

4    that comes later and so forth.  But if you just follow the

5    roadmap I think it will be clear enough to you what you need to

6    do.

7            As I said, when you have reached your verdict and the

8    verdict form has been dated and signed by your foreperson, let

9    the court security officer know that you have a verdict and he

10   will bring it to us.

11           Okay, you all -- well, here are a couple more

12   instructions.

13           Some of you have been taking notes during the trial

14   and I just want to tell you that those notes must be used only

15   as a memory aid during your deliberations.  You shouldn't give

16   your notes priority over your independent recollection of the

17   evidence and you shouldn't allow yourself to be unduly

18   influenced by the notes of other jurors.  The notes are not

19   entitled to any greater weight than your memories or

20   impressions about the testimony.

21           You will have some exhibits in the jury room that are

22   transcripts of conversations that you heard played in court.

23   I've admitted those transcripts for the limited and secondary

24   purpose of helping you to follow the content of the

25   conversations as you listen to the tape recording and to help

1    you identify the speakers.  But you are instructed that whether

2    the transcript correctly reflects the content of the

3    conversations or the identity of the speakers is entirely for

4    you to decide based on your own examination of the transcript

5    in relation to the tape-recording itself, which is the primary

6    evidence.

7           If you determine the transcripts aren't correct or

8    that they're unreliable in any respect you should disregard

9    them to that extent.

10          You are instructed that each count of the indictment

11   charges a separate crime.  You must consider each crime and the

12   evidence relating to it separately.  You must consider the case

13   of each defendant separately and individually.  If you find a

14   defendant guilty of one crime that must not affect your verdict

15   for any other crime or the other defendant.

16          I caution you that each defendant is on trial only

17   for the specific crimes charged.  You're here to determine from

18   the evidence whether each defendant is guilty or not guilty.

19          Your verdict, whether guilty or not guilty, must be

20   unanimous.  In other words, you must all agree.

21          All right, ladies and gentlemen, you can go on into

22   the jury room and select your foreperson.  Don't begin your

23   deliberations until you've gotten the documents from us.

24          And I need to be reminded who the alternates are.

25          THE COURTROOM DEPUTY:  Suzanne Graham and Jon Virde.

1          THE COURT:  Who are the alternates?  Will you raise

2     your hands?  Okay.  Do you all have things in the jury room you

3     need to get out?  All right.  Well, if you do, go ahead and

4     step on into the jury room and get your stuff and then if you

5     would come right back into the courtroom I'd like to speak to

6     you before you leave.  You all may retire.

7          (Jury retired from the courtroom at 2:12 p.m.;

8     alternate jurors return to the courtroom.)

9          THE COURT:  Please have a seat.  Ms. Graham and

10    Mr. Virde, I just wanted to thank you for serving on the jury.

11    You all have paid close attention throughout the trial and I

12    wish that we could use you in the deliberations but we are

13    limited to 12 people.  So thank you so much for being on the

14    jury, we appreciate it.  You are excused to go on and go home.

15    There is the tiniest chance that we might have to call you

16    back.  That would happen if people get sick, that kind of

17    thing.  So for that reason I am going to instruct you even at

18    this time not to discuss the case with anybody else and if I

19    don't see you again, thank you.  You all can go on out the back

20    door now.

21         (Alternate jurors exit the courtroom.)

22         THE COURT:  Okay, any exceptions to the charge?

23         MR. SCARBOROUGH:  Not as to Mr. Dixon, Your Honor.

24         MR. SECRET:  Not as to Mr. Floyd.

25         MS. WEBB:  Not for the government, Your Honor.

1          THE COURT:  All right.  Is the evidence ready to go

2     in?  All right, let's send it back.

3          MS. WEBB:  Yes.

4          THE COURT:  And just out of an abundance of caution,

5     Counsel, come on up and look at that verdict form and make sure

6     it is the final one.  They're going to need the Mossberg.

7          MS. WEBB:  She was saying -- this is the verdict

8     form -- the Court was saying, I believe, that the jury is going

9     to need to look at the Mossberg probably themselves.  I mean,

10    we were -- to us they're admitted into evidence, we weren't

11    planning on taking them anywhere.

12         THE COURT:  Why don't we do this, if it's acceptable

13    to you all.  I will just have Ms. Hanna -- we'll send the

14    Mossberg in and I'll have her step in and say there were some

15    other weapons admitted into evidence and if you all want to see

16    them let us know or something like that.

17         MS. WEBB:  That's fine.  The one thing I would say

18    before she takes it in, the shells have been admitted into

19    evidence so you might want to take those out of the cart

20    before --

21         AGENT BURNETT:  Mary, they're already there.

22         MS. WEBB:  We got them, okay.  We didn't put them on

23    the cart.

24         THE COURTROOM DEPUTY:  We don't want to put that

25    ammunition back there.

1           THE COURT:  No.  If they want so see the other guns

2     or the ammunition just let us know and we'll send them in and

3     that ought to do it.

4           MR. SCARBOROUGH:  The only objection as to Mr. Dixon

5     is the one previously stated about Count Four, Your Honor.

6           THE COURT:  Okay.

7           MR. SCARBOROUGH:  Thank you.

8           MR. SECRET:  No objections on behalf of Mr. Floyd.

9           THE COURT:  All right.  If you all decide to leave

10    the premises let us have your -- leave the courtroom, make sure

11    Ms. Hanna has your cell phone numbers.  Thank you, Counsel.

12           (Jury deliberations ensued; following proceedings

13    outside the presence of the jury at 2:55 p.m.)

14           THE COURT:  Well, we have several notes from the

15    jury.  Have counsel already seen them?

16           THE COURTROOM DEPUTY:  Yes.

17           THE COURT:  Okay.  The first note here is:  "What is

18    the reason to have a shorter barrel, 16 inches versus 18

19    inches?"

20           Comments or suggestions from counsel?

21           MR. SCARBOROUGH:  I just think the Court shouldn't

22    answer.

23           THE COURT:  Anybody else?

24           MR. SECRET:  That's not in evidence.

25           THE COURT:  No, it is not in the evidence and I also

1    think it's just a question I can't answer.  I mean, we know why

2    but we can't tell them.

3              Next question:  "What is the Hobb Act?

4              Any suggestions?

5              MS. WEBB:  I believe the Court already said it in

6    part -- or in the jury charge and it would be fine for the

7    Court to again tell them that it's 18 U.S.C. 1951, which is

8    also called the Hobbs Act.

9              MR. SCARBOROUGH:  You know --

10             THE COURT:  It is charged in, it's a violation of the

11   Hobbs Act that's charged in Count One.

12             MR. SCARBOROUGH:  Just to say that's the name of an

13   act of Congress and you should infer nothing from the name.

14             THE COURT:  Next question:  "What happened to Wilson

15   (Dog-Man) in this case?"

16             Comments or suggestions?

17             MR. SECRET:  I don't think we can answer that either,

18   Judge.

19             THE COURT:  Anybody else?

20             MS. WEBB:  And maybe just clarify for them he's not

21   standing trial right now and that otherwise -- yeah, it's not

22   ultimately an issue.

23             THE COURT:  Okay, I guess that's it.  Bring the jury

24   in.

25             (Jury returned to the courtroom at 2:59 p.m.)

1          THE COURT:  Are you Mr. Hines?

2          THE FOREMAN:  I am.

3          THE COURT:  Mr. Hines, thank you for the note.  I've

4    talked with counsel about it.  There's not too much I'm going

5    to be able to tell you in response to your questions.

6          The first question has to do with what is the reason

7    for the shorter barrel requirement.  I'm sorry, that is a

8    question I cannot answer.

9          You all want to know what is the Hobbs Act.  The

10   Hobbs Act is a federal statute.  It's Title 18, United States

11   Code, Section 1951.  This is the basis for the charge in Count

12   One of the indictment, the Hobbs Act.  And you may recall, I

13   told you that the Hobbs Act, that is that statute, makes it a

14   federal crime for anyone to conspire or agree with someone else

15   to obtain or take the property of another by robbery and, in so

16   doing, to obstruct, delay, or affect commerce or the movement

17   of articles in commerce, is what the Hobbs Act is.  It's

18   charged in Count One.

19         Okay, then finally, you all want to know what

20   happened to Wilson, Dog-Man, in this case.  That's a question I

21   can't answer, I'm sorry.

22         All right, I think I've answered the questions you

23   all have asked.  You can go ahead and retire and continue your

24   deliberations.

25         (Jury retired from the courtroom at 3:01 p.m.)

1          THE COURT:  Any exceptions?

2          MR. SCARBOROUGH:  No, Your Honor.

3          MR. SECRET:  No, Your Honor.

4          MS. WEBB:  No, Your Honor.

5          THE COURT:  All right, we'll be in recess until

6    further order.

7          (Jury deliberations ensued; following proceedings

8    outside the presence of the jury at 4:05 p.m.)

9          THE COURT:  We have a note from the jury and I assume

10   counsel have seen it.

11         MR. SECRET:  Yes, Your Honor.

12         THE COURT:  "Can you give us the definition of

13   conspiracy on being present?"

14         I don't understand the jury's question.  Do you all

15   want to make any suggestions?

16         MS. WEBB:  Your Honor, the pattern conspiracy

17   instructions do contain a reference to a defendant's presence

18   and they say that mere presence is not enough, I believe is

19   what is in there.  My suggestion would be just to reread the

20   conspiracy charges to the jury.

21         THE COURT:  Well, the question is which conspiracy

22   charges.

23         MS. WEBB:  I think the two conspiracy -- the charge

24   as to Count One and the charge as to Count Three contain the

25   same definition of conspiracy because both of those are

1    conspiracies based off of statutes that don't require an overt

2    act and so they both contain the language about a conspiracy is

3    an agreement and all that and I think they both contain the

4    language as to --

5              THE COURT:  Other suggestions?

6              MR. SCARBOROUGH:  I think that's right and I think if

7    the Court wanted to read that once and just say it applied to

8    Counts One and Three that would be fine.  I think the Court did

9    end up reading the same language twice just because that's the

10   way the instructions were put together.  But that would zero in

11   on it, I think.

12             MS. WEBB:  I mean, they may be confused as to whether

13   somebody has to be present to be a part of a conspiracy.

14             MR. SCARBOROUGH:  I think I would include all of the

15   conspiracy part of the charge rather than singling out a

16   sentence from it.

17             THE COURT:  The problem is Count One is tailored to

18   the Hobbs Act and Count Three is tailored to Section 846,

19   drugs.

20             MS. WEBB:  Is there a way to ask -- to follow up with

21   the jury and ask them?

22             THE COURT:  Sure, yeah, I mean I could.

23             MS. WEBB:  That may be the best thing to do because

24   if they're confused about whether someone has to be present

25   versus being confused about mere presence, those are pretty

1   different and I don't know that the confusion about whether

2   someone has to be present would be cleared up by just

3   rereading --

4           THE COURT:  I don't think -- no matter what I say

5   that's not going to clear that up.  That's something they would

6   have to just decide.

7           MR. SCARBOROUGH:  Your Honor, you may just want to

8   reread the substantive offense instructions for One and Three

9   in their entirety.  That may take a minute longer but that

10  might be sort of the safest thing to do.

11          THE COURT:  Bring the jury in.

12          (Jury returned to the courtroom at 4:11 p.m.)

13          THE COURT:  Mr. Hines -- excuse me, you all can sit

14  down, I jumped the gun for a moment.

15          I have discussed your all's notes with counsel.  Let

16  me ask you this question, when you're asking about definition

17  of conspiracy, does this contain to Count One or Count Three or

18  both?

19          THE FOREPERSON:  Question's about Count One.  You had

20  said earlier if someone's there doesn't make them guilty but --

21          THE COURT:  Okay.  That's all I need to know.  Let me

22  just talk to you again about Count One.

23          Both defendants are charged in Count One with

24  conspiring to rob a person who they believed to be engaged in

25  narcotics trafficking.

1          Title 18 U.S. Code, Section 1951, makes it a federal

2     crime for anyone to conspire or agree with someone else to

3     obtain or take the property of another by robbery and, in doing

4     so, to obstruct, delay, or affect commerce or the movement of

5     articles of commerce.

6          A conspiracy is an agreement by two or more people to

7     commit an unlawful act.  In other words, it's a kind of

8     partnership in criminal purposes.  Every member of a conspiracy

9     becomes the agent or partner of every other member.

10          The government does not have to prove that all the

11     people named in the indictment were members of the plan, or

12     that those who were members made any kind of formal agreement.

13          The government does not have to prove that the

14     members planned together all of the details of the plan.  The

15     heart of a conspiracy is the making of the unlawful plan

16     itself, so the government does not have to prove that the

17     conspirators succeeded in carrying out the plan.

18          A defendant can be found guilty of that offense as

19     charged in Count One only if all of the following facts are

20     proved beyond a reasonable doubt:  First, that two or more

21     individuals in some way agreed to commit a robbery encompassed

22     within the Hobbs Act, that's the statute we're talking about;

23     secondly, that the goal of the conspiracy, that is the

24     robbery -- excuse me, that the defendant in question knew of

25     the goal of the conspiracy, that is, the robbery; and, third,

1   that the defendant in question willfully participated in

2   helping to accomplish the goal.

3          Factual impossibility is not a defense to conspiracy

4   under the Hobbs Act.  The essence of the conspiracy charge is

5   the agreement itself.  Therefore, the fact that it may have

6   been factually impossible for the conspirators to accomplish

7   their goal is not a defense to the conspiracy charge alleged in

8   this case.

9          A person may be a conspirator without knowing all the

10  details of the unlawful plan or the names and identities of all

11  the other alleged conspirators.

12         If a defendant played only a minor part in the plan

13  but had a general understanding of the unlawful purpose of the

14  plan and willfully joined in the plan on at least one occasion,

15  that is enough for you to find that defendant guilty.  But

16  simply being present at the scene of an event or merely

17  associating with certain people and discussing common goals and

18  interests doesn't establish proof of a conspiracy.  A person

19  who doesn't know about a conspiracy but who happens to act in a

20  way that advances some purpose of one does not automatically

21  become a conspirator.

22         I believe that does cover what you all were asking

23  about in your question.

24         THE FOREPERSON:  Yes.

25         THE COURT:  You all may retire and resume your

1    deliberations.

2              (Jury retired from the courtroom at 4:18 p.m.)

3              THE COURT:  Any exceptions to the charge?

4              MR. SECRET:  No, Your Honor.

5              MR. SCARBOROUGH:  No, Your Honor.

6              MS. WEBB:  No, Your Honor.

7              THE COURT:  We'll be in recess.

8              (Jury deliberations ensued; following proceedings

9    outside the presence of the jury at 5:00 p.m.)

10             THE COURT:  We're going to call it quits for the day.

11   Bring the jury in.

12             (Jury returned to the courtroom.)

13             THE COURT:  Please be seated.  Members of the jury,

14   we are going to stop at this point for this evening.  Please be

15   in the jury room by 9:30 on Monday morning and we'll be ready

16   to go again.  When all members of the jury are present, but not

17   before that, you can go ahead and begin your deliberations

18   again.

19             Remember over the weekend not to discuss this case

20   with anybody and not among yourselves, either.  Just put the

21   case out of your mind, be in the jury room by 9:30 on Monday

22   and have a great weekend.  Good night.

23             (Jury retired from the courtroom at 5:03 p.m.)

24             THE COURT:  Thank you.  You all have a seat.

25   Returning briefly to the issue I mentioned about Count Four, I

1    realized after the last time we discussed the matter that I

2    actually instructed the jury that only Defendant Floyd was

3    charged in Count Four.

4              MS. WEBB:  I think you said both defendants have been

5    charged in Count Four.

6              THE COURT:  I don't think I did and the reason I

7    think that I said only -- the reason I believe I told them

8    Defendant Floyd is because that's what the government's charge

9    request says.

10             MS. WEBB:  It is what the government's charge request

11   says.  I listened carefully and I thought Your Honor corrected

12   it on the fly, as it were, and said both defendants.  I don't

13   know if defense counsel has a different --

14             THE COURT:  I don't think I did but that's just my

15   recollection.  I have no transcript.  Anyway, I just thought I

16   would mention that.  All right, you all have a good weekend.

17             (Proceedings adjourned at 5:05 p.m.)

18

19

20

21

22

23

24

25

712

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6            I hereby certify that the foregoing pages, 609

7    through 711, are a true and correct copy of the proceedings in

8    the case aforesaid.

9            This the 8th day of January, 2014.

10

11
                         /s/ *Amanda Lohnaas*
12                   _____
                     Amanda Lohnaas, CCR-B-580, RMR, CRR
13                   Official Court Reporter
                     United States District Court
14

15

16

17

18

19

20

21

22

23

24

25